KOOTENAI TRIBE OF IDAHO; Boise County, by and through the Boise County Board of Commissioners; Valley County, by and through the Valley County Board of Commissioners; the Blueribbon Coalition, Inc.; Idaho State Snowmobile Associates, Inc.; Illinois Association of Snowmobile Clubs; the American Council of Snowmobile Associations; Little Cattle Company Limited Partnership; Highland Livestock and Land Company; Boise Cascade Corporation, Plaintiffs–Appellees,

v.

Ann VENEMAN,* in her official capacity as the Secretary of Agriculture; Dale Bosworth,** in his official capacity as the Chief Forester of the USDA Forest Service; Department of Agriculture; United States Forest Service, Defendants,

** Dale Bosworth is substituted for his predecessor, Michael Dombeck, as Chief Forester of the United States Department of Agricul-

Forest Service Employees for Environmental Ethics, Defendant–Intervenor,

and

Idaho Conservation League; Idaho Rivers United, Inc.; Sierra Club; the Wilderness Society; Oregon Natural Resources Council; Pacific Rivers Council; Natural Resources Defense Council, Defendants–Intervenors–Appellants.

Dirk Kempthorne, ex rel State of Idaho; Pete T. Cenarrusa, Secretary of State; Alan G. Lance, Attorney General; J.D. Williams, State Controller; Marilyn Howard, Superintendent of Public Instruction, as the State Board of Land Commissioners; Winston Wiggins, Acting Director, Idaho Department of Lands; Dirk Kempthorne, Governor, in his capacity as Chief Executive of the State of Idaho and President of the Idaho Board of Land Commissioners, Plaintiffs–Appellees,

v.

U.S. Forest Service; Dale Bosworth, in his official capacity as Chief Forester of the United States Forest Service; Ann Veneman, in her official capacity as the Secretary of Agriculture, Defendants,

and

Idaho Conservation League; Idaho Rivers United, Inc.; Sierra Club; the Wilderness Society; Oregon Natural Resources Council; Pacific Rivers Council; Natural Resources Defense Council; Defenders of Wildlife, Defendant–Intervenors–Appellants.

Nos. 01–35472, 01–35539, 01–35476.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Oct. 15, 2001.

Filed Dec. 12, 2002.

ture's Forest Service. Fed. R.App. P. 43(c)(2).

Fund, Bozeman, MT; Nathaniel S.W. Lawrence, Natural Resources Defense Council, Olympia, WA, for defendants-intervenors-appellants Idaho Conservation League, et al.

Raymond B. Ludwiszewski (argued), Peter E. Seley, Hassan A. Zavareei, Gibson, Dunn, & Crutcher, Washington, DC, for plaintiffs-appellees Kootenai Tribe of Idaho, et al.

Alan G. Lance, Idaho Attorney General, Clive J. Strong, Deputy Attorney General, Chief, Natural Resources Division, Steven W. Strack (argued), Deputy Attorney General, Natural Resources Division, Boise, ID, for plaintiffs-appellees State of Idaho ex. rel. Dirk Kempthorne, et al.

Patrick Parenteau (argued), Vermont Law School, South Royalton, VT, for defendant-intervenor-appellant Forest Service Employees for Environmental Ethics.

Daniel J. Popeo, Paul D. Kamenar, Richard A. Samp, Washington Legal Foundation, Washington DC, for amici curiae Washington Legal Foundation and United States Senators Larry E. Craig and Mark Dayton.

Mike McGrath, Montana Attorney General, and Candace F. West, Assistant Attorney General, Helena, MT, for amicus curiae Montana Attorney General Mike McGrath.

Douglas L. Honnold (argued) and Timothy J. Preso, Earthjustice Legal Defense

Before FERGUSON, KLEINFELD and GOULD, Circuit Judges.

Opinion by Judge GOULD; Partial Concurrence and Partial Dissent by Judge KLEINFELD.

## OPINION

GOULD, Circuit Judge:

### I

This case involves procedural challenges to a United States Forest Service rule, known commonly as the "Roadless Rule," with a potential environmental impact restricting development in national forest lands representing about two percent of the United States land mass.[1] These challenges in essence urge that the Roadless Rule was promulgated without proper process and that it is invalid. The case also presents constitutional and procedural issues about the ability of the plaintiffs and of the proposed intervenors to be heard.

But we must start closer to the beginning: This appeal arises out of litigation that began on January 8, 2001 when Kootenai Tribe of Idaho and Boise Cascade Corporation, joined by motorized recreation groups, livestock companies, and two Idaho counties[2] filed suit in the United States District Court for the District of Idaho, alleging that the United States Forest Service's Roadless Area Conservation Rule ("Roadless Rule") violated, *inter alia,* the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321 *et seq.,* and the Administrative Procedure Act ("APA"), 5 U.S.C. § 533. One day later, the State of Idaho and some state officeholders (collectively "Idaho plaintiffs") filed a separate complaint in the District of Idaho and stated similar allegations. Environmental groups intervened. The district court granted plaintiffs' motions for preliminary injunction against the implementation of the Roadless Rule. Although the federal defendants did not appeal the invalidation of the Roadless Rule, an appeal was taken in both cases by intervenors. We consolidated the appeals and have jurisdiction under 28 U.S.C. § 1292(a)(1).

We hold that the district court had discretion to permit intervention, under Fed. R.Civ.P. 24(b), and intervenors now can bring this appeal under Fed.R.Civ.P. 24(b); that plaintiffs have standing to challenge the Roadless Rule; and, assessing the merits, that the district court abused its discretion in granting preliminary injunction against implementation of the Roadless Rule.

### II

#### A. *History of the Roadless Rule*

In the 1970s, the United States Forest Service ("Forest Service") began to study and evaluate roadless areas in national forests. The Forest Service developed an "inventory" of roadless areas, each larger than five thousand acres. There are now 58.5 million acres of inventoried roadless areas in the National Forest System.

The Forest Service, in an odd semantic twist,[3] has included in "inventoried road-

---

1. The case has generated interest in business, environmental and political communities. We have received amicus briefs from: Washington Legal Foundation and United States Senators Larry E. Craig and Mark Dayton; Nez Perce Tribe; and Montana Attorney General Mark McGrath.

2. The co-plaintiffs joined with the Kootenai Tribe are: the BlueRibbon Coalition, Boise County, Idaho, Valley County, Idaho, Idaho State Snowmobile Association, Illinois Association of Snowmobile Clubs, American Council

of Snowmobile Associations, Little Cattle Company Limited Partnership, Highland Livestock and Land Company and Boise Cascade Company.

3. This is perhaps reminiscent of George Orwell's "Newspeak," the name of the artificial language used for official communications in George Orwell's novel *Nineteen Eighty Four,* which is now often applied to corrupt English. *See* OXFORD ENGLISH DICTIONARY (2d ed.1989).

less areas" some areas with roads. Since 1982, the Forest Service has permitted road construction, industrial logging and other development in the inventoried roadless areas on a local, site-specific basis. *See California v. Block*, 690 F.2d 753 (9th Cir.1982). In the past two decades, 2.8 million acres of roadless areas have been developed by the Forest Service.

On October 13, 1999, President William Jefferson Clinton ordered the United States Forest Service to initiate a nationwide plan to protect inventoried and uninventoried roadless areas within our treasured national forests. Within a week of President Clinton's directive, the Forest Service published a Notice of Intent ("NOI") to prepare an Environmental Impact Statement ("EIS") for a nationwide Roadless Rule. The NOI gave sixty days for scoping and public comment. 64 Fed. Reg. 56,306 (Oct. 19, 1999). The Forest Service denied requests to extend the sixty-day scoping period.

After this period, the State of Idaho brought an action, which preceded this one, against the Forest Service on December 30, 1999, alleging that the information presented in the NOI was insufficient and that the Forest Service's refusal to extend the scoping period was arbitrary and capricious. Shortly thereafter, on January 7, 2000, the State of Idaho moved to enjoin the release of the Draft EIS (DEIS) until the Forest Service provided maps of the roadless areas that would be subject to the Proposed Rule. Although the district court in that action urged the Forest Service to allow meaningful participation by the public, the district court dismissed the State's action as unripe because the DEIS and Proposed Rule had not yet been published. No appeal was taken.

On May 10, 2000, the Forest Service published a 700 page DEIS, along with a Proposed Rule. The Proposed Rule identified 54.3 million acres of "inventoried roadless areas." Of these, 51.5 million acres were "unroaded" and 2.8 million acres were classified as "roaded."[4] The Proposed Rule would have banned road building on the 51.5 million unroaded acres but exempted the 2.8 million roaded acres from the Rule's proscription. After the DEIS's release, the Forest Service allowed sixty-nine days for public comment. Again, some sought extensions of time to file comments and, again, the Forest Service denied requests for extensions, maintaining its schedule.

On November 13, 2000, the Forest Service published a final EIS ("FEIS"). The FEIS identified 58.5 million acres of "inventoried roadless areas" subject to the Roadless Rule's prohibition on road construction. Included were 4.2 million acres of inventoried roadless areas not identified in the DEIS and Proposed Rule. Also, the Proposed Rule now applied to the 2.8 million acres of "roaded" inventoried roadless areas, while relaxing standards for timber harvest in "roaded" areas. No maps in the FEIS identified the 2.8 million acres of "roaded" land.

On January 5, 2001, the Forest Service issued the Final [Roadless] Rule, applicable to the 58.5 million acres identified in the FEIS. It was to be implemented on March 13, 2001. It generally banned road building subject to limited exceptions including: the preservation of "reserved or outstanding rights" or discretionary Forest Service construction necessary for pub-

**4.** Some inventoried roadless areas have roads because: (1) the criteria used by the Forest Service when it made its inventory of "roadless" areas included some areas with roads; and (2) after the Forest Service completed its inventory in the 1970s, some roads were built on inventoried roadless land.

lic health and safety. 36 C.F.R. § 294.12(b)(1),(3). Henceforth, this vast national forest acreage, for better or worse, was more committed to pristine wilderness, and less amenable to road development for purposes permitted by the Forest Service.

### B. *Procedural History*

On January 8, 2001, three days after the Final Rule was issued, the Kootenai Tribe, and the private and county plaintiffs joined with it, filed suit alleging that the Roadless Rule was illegal. On January 9, 2001, the Idaho plaintiffs filed suit with similar claims. Both sets of plaintiffs alleged violations of the NEPA and the APA.

On January 20, 2001, newly-inaugurated President George Walker Bush issued an order postponing by sixty days the effective date of all the prior administration's regulations and rules not yet implemented. The effective date of the Roadless Rule was thus postponed until May 12, 2001. Before then, on February 20, 2001, the Kootenai Tribe and its co-plaintiffs moved for a preliminary injunction against implementation of the Roadless Rule. The Idaho plaintiffs did the same on March 7, 2001. Both sets of plaintiffs argued that the Roadless Rule would cause them irreparable harm by preventing their access to the national forests for proper purposes. Plaintiffs argued that such access was necessary to counter wildfires and threats from insects and disease. The plaintiffs based their motion for preliminary injunction upon alleged violations of NEPA, National Forest Management Act ("NFMA") and the APA.

Thereafter, on March 14, 2001, the district court granted the motion of the Idaho Conservation League, joined by other environmental organizations[5] (collectively, "ICL") to intervene as defendants in both cases. The district court also granted the motion of the Forest Service Employees for Environmental Ethics ("FSEEE") to intervene as a defendant in the complaint brought by Kootenai Tribe and its co-plaintiffs.

On April 5, 2001, the district court issued an order in each case, holding that the plaintiffs had a likelihood of success on their motions for a preliminary injunction. However, the district court reserved ruling on plaintiffs' preliminary injunction motions until the administration of President Bush updated the court on its ongoing review of the Roadless Rule. On May 4, 2001, eight days before the Roadless Rule was to go into effect, the Forest Service told the district court that because of "concerns about the process through which the Rule was promulgated," the Forest Service planned to "initiate an additional public process that [would] ... examine possible modifications to the Rule." Although the Forest Service would let the Roadless Rule go into effect, the Forest Service told the district court that it would also "develop[ ] proposed amendments to the Rule that will seek to maintain the protections embodied in the current rule." In particular, the Forest Service planned to amend the Rule to allow "limited activities to prevent the negative effects of unnaturally severe wildfires, insect infestation and disease."[6]

---

5. The environmental organizations joined with Idaho Conservation League as co-defendants-intervenors are: Idaho Rivers United, Sierra Club, The Wilderness Society, Oregon Natural Resources Council, Pacific Rivers Council, Natural Resources Defense Council, and the Defenders of Wildlife.

6. As described by the administration of President Bush, the new process would provide accurate mapping data and provide more public comment process for considering amendments to the Rule.

Thereafter, on May 10, 2001, the district court found that the plaintiffs had shown that there was "a strong likelihood of success on the merits"; that there existed, absent amendments to the Roadless Rule proposed by the federal government under President Bush's administration, a "substantial possibility that the Roadless Rule will result in irreparable harm to the National Forests"; that there was no date certain for amendments nor guarantee that amendments would "cure the defects identified by the Court and acknowledged to exist by the Federal Government"; and finally and accordingly, that "the Court finds that Plaintiffs have made the minimal showing of irreparable harm and will order that the injunction issue."

ICL and FSEEE filed their Notices of Appeal on May 11 and May 15, 2001, respectively. The federal defendants did not appeal.

### III

This appeal presents an unusual procedural setting: The federal defendants, enjoined from "implementing all aspects of the Roadless Area Conservation Rule," have not appealed the injunctions. The interlocutory appeals before us were brought by the environmental groups

granted status as defendant-intervenors by the district court. We must determine whether the intervenors may defend the government's alleged violations of NEPA and the APA when the federal defendants have decided not to appeal the district court's preliminary injunction against implementation of the Roadless Rule. Stated another way, if the federal government no longer contests the plaintiffs' positions and the court's ruling, may interested persons as intervenors defend the challenged government processes?

This case requires us to apply Federal Rule of Civil Procedure 24, governing intervention. We must consider standards in section (a) for intervention as of right and in section (b) for permissive intervention.[7]

■■■ We first assess Rule 24(a), as the district court heavily relied on it in the district court's analysis sustaining intervention as a matter of right. Our prior precedent establishes a four part test for determining, under Rule 24(a), if an applicant has a right to intervene: (1) the motion must be timely; (2) the applicant must assert a "significantly protectable" interest relating to property or a transaction that is the subject matter of litigation; (3) the applicant must be situated so that disposi-

---

7. Rule 24 by its terms states in relevant part:

(a) Intervention of Right. Upon timely application anyone shall be permitted to intervene in an action: (1) when a statute of the United States confers an unconditional right to intervene; or (2) when the applicant claims an interest relating to the property or transaction which is the subject of the action and the applicant is so situated that the disposition of the action may as a practical matter impair or impede the applicant's ability to protect that interest, unless the applicant's interest is adequately represented by existing parties.

(b) Permissive Intervention. Upon timely application anyone may be permitted to intervene in an action: (1) when a statute of

the United States confers a conditional right to intervene; or (2) when an applicant's claim or defense and the main action have a question of law or fact in common. When a party to an action relies for ground of claim or defense upon any statute or executive order administered by a federal or state governmental officer or agency or upon any regulation, order, requirement, or agreement issued or made pursuant to the statute or executive order, the officer or agency upon timely application may be permitted to intervene in the action. In exercising its discretion the court shall consider whether the intervention will unduly delay or prejudice the adjudication of the rights of the original parties.

tion of action may as a practical matter impair or impede the interest; and (4) the applicant's interest must be inadequately represented by the parties. *Wetlands Action Network v. United States Army Corps of Eng'rs,* 222 F.3d 1105, 1113–14 (9th Cir.2000); *Sierra Club v. U.S. E.P.A.,* 995 F.2d 1478, 1481 (9th Cir.1993).

The district court, noting ambiguity in our precedents and welcoming "clarification" from the Ninth Circuit, concluded that the intervenor "Applicants have demonstrated a legally protectable interest related to the claims in issue," specifically that environmental, conservation and wildlife interests asserted by intervenors "are necessarily related to the interests intended to be protected by the NEPA, the statute at issue, and as disposition of this suit might, as a practical matter, impair the ability of the Applicant organizations to protect their interests, the Court finds that the Applicants have demonstrated a legally protectable interest related to the claims at issue."

■ Our prior case law is not perhaps crystal clear, and we understand the district court's recognition of the important interests at stake. However, we see it a different way, respectfully disagree with the district court's conclusions, and conclude that the district court erred in applying Rule 24(a). We read our precedent to hold that the private intervenors in this NEPA action may not intervene as of right pursuant to Rule 24(a). "As a general rule, 'the federal government is the only proper defendant in an action to compel compliance with NEPA.' " *Wetlands,* 222 F.3d 1105, 1114 (quoting *Churchill County v. Babbitt,* 150 F.3d 1072, 1082, *as amended by* 158 F.3d 491 (9th Cir.1998)); *see also Portland Audubon Society v. Hodel,* 866 F.2d 302, 309 (9th Cir.1989). This rule is based on the premise that private parties do not have a "significant protectable

interest" in NEPA compliance actions. As explained in *Wetlands:* "The rationale for our rule is that, because NEPA requires action only by the government, only the government can be liable under NEPA. Because a private party can not violate NEPA, it can not be a defendant in a NEPA compliance action." *Wetlands,* 222 F.3d at 1114 (internal quotations and citations omitted). Based on this precedent, we conclude that the district court erred to the extent it permitted intervention as of right under Rule 24(a).

■ There remains for consideration the possibility, which was not addressed in *Wetlands,* that permissive intervention under Rule 24(b), which also was relied upon by the district court, sustains the ability of intervenors to proceed before the district court and in this appeal to give "defense" of the government's rulemaking. Unlike Rule 24(a), a "significant protectable interest" is not required by Rule 24(b) for intervention; all that is necessary for permissive intervention is that intervenor's "claim or defense and the main action have a question of law or fact in common." Fed.R.Civ.P. 24(b). Rule 24(b) "plainly dispenses with any requirement that the intervenor shall have a direct personal or pecuniary interest in the subject of the litigation." *SEC v. U.S. Realty & Improvement Co.,* 310 U.S. 434, 459, 60 S.Ct. 1044, 84 L.Ed. 1293 (1940). A leading treatise has explained:

The rule does not specify any particular interest that will suffice for permissive intervention and, as the Supreme Court has said, it plainly dispenses with any requirement that the intervenor shall have a direct personal or pecuniary interest in the subject of the litigation. Indeed, it appears that the intervenor-by-permission does not even have to be a person who would have been a proper party at the beginning of the suit. . . .

Close scrutiny of the kind of interest the intervenor is thought to have seems especially inappropriate under Rule 24 since it makes no mention of interest. The rule requires only that his claim or defense and the main action have a question of law or fact in common.... If there is a common question of law or fact, the requirement of the rule has been satisfied and it is then discretionary with the court whether to allow intervention.

7C Wright, Miller & Kane, Federal Practice and Procedure § 1911, 357–63 (2d ed.1986). The argument appellees make based on cases addressing intervention as of right under Rule 24(a), is not controlling as to the analysis under Rule 24(b) of the district court's alternative holding that permissive intervention was appropriate.

 Before we address whether the district court erred in granting intervention under Federal Rule of Civil Procedure 24(b), we must first determine whether intervenors have Article III standing to pursue this appeal in defense of the Roadless Rule without the government as an appellant, leaving intervenors as the only parties on appeal adverse to plaintiffs. In this unusual context, our precedent requires that we find "independent jurisdictional grounds" for the defendant-intervenors' appeal. *Didrickson v. United States Dep't of the Interior*, 982 F.2d 1332, 1337–38 (9th Cir.1992) (internal quotations and citations omitted) ("A permissive defendant-intervenor must have independent jurisdictional grounds on which to pursue an appeal, absent an appeal by the party on whose side the intervenor intervened. An interest strong enough to permit intervention is not necessarily a sufficient basis to pursue an appeal abandoned by the other parties.").

 To establish standing, the defendant-intervenors must first show that they have suffered an injury in fact, " 'an invasion of a legally-protected interest' that is concrete and particularized, and actual or imminent." *Didrickson*, 982 F.2d at 1340 (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1991)); *see also Friends of the Earth, Inc. v. Laidlaw Envtl. Serv.*, 528 U.S. 167, 180–81, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000). Considering standing of intervenors, specifically, we have held that "[i]ntervenors in environmental litigation satisfy the injury in fact requirement by showing that group members have direct contact with the environmental subject matter threatened by the adverse decision." *Idaho Farm Bureau Fed'n v. Babbitt*, 58 F.3d 1392, 1398 (9th Cir.1995) (citing *Didrickson*, 982 F.2d at 1340). In *Didrickson*, where intervenors were appealing a decision striking down a regulation protecting Alaskan sea otters, intervenors satisfied the injury in fact requirement by demonstrating that their members were Alaska residents who studied, observed, and enjoyed the otters in Alaska. *Didrickson*, 982 F.2d at 1340–41.

Here, both sets of intervenors have demonstrated injury in fact. FSEEE's members work in the National Forests containing the roadless areas and regularly use them for a variety of outdoor recreation and nature appreciation, as found by the district court. Similarly, ICL's staff and members hunt, hike, fish and camp in roadless areas. These areas were to be protected by the Roadless Rule but will have less protection from development if the district court's injunction is sustained. This is sufficient to establish an injury in fact. *See Idaho Farm Bureau Fed'n*, 58 F.3d at 1398–99 (finding injury in fact where ICL members' use of endangered species habitat would be impaired by district court ruling overturning species pro-

tection). Whatever protections of the involved environmental interests remain in the absence of the Roadless Rule,[8] there can be no doubt that the 58.5 million acres subject to the Roadless Rule, if implemented, would have greater protection if the Roadless Rule stands.

■ In addition to injury in fact, to establish standing intervenors must show a causal connection between the injury and the conduct complained of and that the injury will likely be redressed by the relief requested. *Id.* at 1399. For standing on appeal, intervenors need not show that they independently could have sued the party who prevailed in district court. *Didrickson*, 982 F.2d at 1338. "Intervenors can allege a threat of injury stemming from the order they seek to reverse, an injury which would be redressed if they win on appeal." *Idaho Farm Bureau Fed'n*, 58 F.3d at 1399 (citing *Yniguez v. Arizona*, 939 F.2d 727, 731–32 (9th Cir. 1991)).

Applying these standards, the intervenors satisfy standing requirements. The injury to both FSEEE and ICL, an increased risk of road development affecting conservation and environmental interests of applicants and their members, is "traceable" to the district court's order granting the injunction. This "injury" would be redressed by a decision of this Court lifting the injunction and allowing the Roadless Rule to have force. We hold that FSEEE and ICL have Article III standing to bring this appeal.

■ We now analyze permissive intervention under Rule 24(b). A district court's decision to grant or deny permissive intervention under Rule 24(b) is reviewed for an abuse of discretion. *See Beckman Indus. Inc. v. Int'l Ins. Co.*, 966 F.2d 470, 472 (9th Cir.1992). Under Rule 24(b) the question here is whether the applicants to intervene assert a claim or defense in common with the main action. Here, the intervenors asserted their interests related to the Roadless Rule in moving to intervene, and after intervention was granted asserted defenses of the Roadless Rule directly responsive to the claims for injunction asserted by plaintiffs.[9] Intervenors satisfied the literal requirements of Rule 24(b), and it was within the district court's discretion to decide whether to permit them to participate. It is correct, on the one hand, that the intervenors do not have an independent protectable interest under *Wetlands*. That decides against intervention under Rule 24(a), but does not control application of Rule 24(b). The intervenors asserted defenses of the Roadless Rule directly responsive to the claim for injunction. Moreover, though intervenors do not have

---

**8.** Absent the Roadless Rule, development cannot proceed without constraint. Creation of any road that "significantly affect[s] the quality of the human environment" will continue to require NEPA compliance, 42 U.S.C. § 4332(C).

**9.** On February 6, 2001, ICL and other environmental organizations moved to intervene as defendants. A memorandum in support of intervention asserted that ICL and the other organizations had an interest in the Roadless Rule that was the subject of the lawsuit "as well as in the roadless lands protected by the Rule." On March 2, 2001, FSEEE moved to intervene. FSEES's supporting memorandum asserted that its members had a professional stake in the Roadless Rule and also that they used and enjoyed the roadless lands for recreational pursuits. After intervention was granted by the district court's order of March 14, 2001, the ICL and related organizations as defendant-intervenors filed a responsive memorandum opposing plaintiffs' motion for preliminary injunction on March 21, 2001. The FSEEE as defendant-intervenor filed a response to the defendants' status report and opposition to plaintiffs' request for preliminary injunction on May 10, 2001.

a direct interest in the government rule-making, they have asserted an interest in the use and enjoyment of roadless lands, and in the conservation of roadless lands, in the national forest lands subject to the Roadless Rule, and they assert "defenses" of the government rulemaking that squarely respond to the challenges made by plaintiffs in the main action.

 As a rule of construction, Federal Rules of Civil Procedure are given their plain meaning. *Bus. Guides, Inc. v. Chromatic Comm. Enterp., Inc.*, 498 U.S. 533, 540, 111 S.Ct. 922, 112 L.Ed.2d 1140 (1991). Rule 24(b)(2) provides that on timely application the court may allow an absentee to intervene "when an applicant's claim or defense and the main action have a question of law or fact in common." The language of the rule makes clear that if the would be intervenor's claim or defense contains no question of law or fact that is raised also by the main action, intervention under Rule 24(b)(2) must be denied. But, if there is a common question of law or fact, the requirement of the rule has been satisfied and it is then discretionary with the court whether to allow intervention. That appears to be precisely the case here.

Moreover, the court expressly noted that "the magnitude of this case is such that both Applicants' intervention will contribute to the equitable resolution of this case," permitting permissive intervention; thus the court gave a good and substantial reason for exercising its discretion to permit the permissive intervention.[10] In fact, the government declined to defend fully

from the outset, suggesting that the government itself saw problems and wanted to amend the Roadless Rule. Under these circumstances it is clear, as the court itself recognized, that the presence of intervenors would assist the court in its orderly procedures leading to the resolution of this case, which impacted large and varied interests. The district court did not abuse its discretion in granting the intervenors permissive intervention under Rule 24(b).

## IV

 Intervenors allege that the district court erred by determining that plaintiffs have constitutional standing to assert their claims.[11] The United States Supreme Court has made clear that to satisfy Article III's standing requirements, a plaintiff must show that "(1) it has suffered an injury in fact that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Envtl. Serv.*, 528 U.S. 167, 180–81, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000). See also *Lujan*, 504 U.S. at 560, 112 S.Ct. 2130. We have also held: "In addition to these constitutional requirements, a plaintiff bringing suit under the Administrative Procedure Act for a violation of NEPA must show that his alleged injury falls within the 'zone of interests' that NEPA

10. We note that in exercising its discretion, the court is to consider "whether the intervention will unduly delay or prejudice the adjudication of the rights of the original parties." Fed. R. Civ. Pro. 24(b)(2). Here there was no suggestion in the record that intervention would cause undue delay in resolution. To the contrary, because the intervention motions were filed near the case outset and the

defendant-intervenors said they could abide the court's briefing and procedural scheduling orders, there was no issue whatsoever of undue delay.

11. Whether plaintiffs have constitutional standing is a question of law that we review de novo. *See Douglas County,* 48 F.3d at 1499.

was designed to protect." *Cantrell v. City of Long Beach*, 241 F.3d 674, 679 (9th Cir.2001); *see also Douglas County v. Babbitt*, 48 F.3d 1495, 1499 (9th Cir.1995).

Intervenors argue that plaintiffs have no Article III standing, urging inadequate basis on each of several required standards. For the reasons outlined below, we conclude that neither the constitution nor our "zone of interests" test stands in the way of plaintiffs' suit.[12]

## A. *Injury in Fact*

 Plaintiffs assert procedural injury based on the Forest Service's alleged violation of NEPA. "To satisfy the injury in fact requirement, [the] plaintiffs asserting a procedural injury must show that the 'procedures in question are designed to protect some threatened *concrete interest* ... that is the ultimate basis of [their] standing'." *Cantrell*, 241 F.3d at 679 (quoting *Lujan*, 504 U.S. at 573, 112 S.Ct. 2130 (emphasis added)). Under NEPA, plaintiffs can show "threatened concrete interests" by demonstrating a "geographic nexus" between their NEPA claims and the land allegedly suffering an environmental impact. *See id.; Douglas County*, 48 F.3d at 1500 n. 5. Because the Idaho plaintiffs' lawsuit and the lawsuit filed by Kootenai Tribe and those joined with it allege different types of injuries, we address injury in fact for plaintiffs in each suit separately.

 The Idaho plaintiffs have ownership interests in land next to the national forests. They allege that implementation of the Roadless Rule will lead to the spread of wildfire, destructive insects and significant harms to their land. The evidence before the district court suggested that implementation of the Roadless Rule and a resulting reduction in active forest management practices could lead to the spread of unnaturally severe wildfires, insect infestation and forest disease from the national forests to adjacent lands. As adjacent landowners, the Idaho plaintiffs have a "sufficient geographic nexus to the site of the challenged project that [they] may be expected to suffer whatever environmental consequences" may result from implementation of the Roadless Rule. *City of Davis v. Coleman*, 521 F.2d 661, 671 (9th Cir.1975).

Notwithstanding, intervenors contend that these alleged harms cannot satisfy the injury in fact requirement because such harms are "not impending." We disagree. That no environmental harm has yet occurred on plaintiffs' land is not controlling. To require that plaintiffs prove particular environmental effects for standing purposes is overmuch and "would in essence be requiring that the plaintiff conduct the same environmental investigation that he seeks in his suit to compel the agency to undertake." *City of Davis*, 521 F.2d at 670–671; *see also Ecological Rights Found. v. Pac. Lumber Co.*, 230 F.3d 1141, 1151 (9th Cir.2000) ("requiring the plaintiff to show actual environmental harm as a condition for standing confuses the jurisdictional inquiry ... with the merits inquiry").

. We next address whether the Kootenai Tribe and its co-plaintiffs have adequately alleged an injury in fact. The Supreme Court has held that "environmental plaintiffs adequately allege injury in fact when they aver that they use the affected area and are persons 'for whom

---

12. Our analysis above points out that intervenors appearing in this appeal without the government must themselves show Article III standing, and that they have properly done so. Many of the considerations informing our judgment that intervenors have standing support that the plaintiffs' standing must be affirmed.

the aesthetic and recreational values of the area will be lessened' by the challenged activity." *Friends of the Earth, Inc.*, 528 U.S. at 183, 120 S.Ct. 693 (quoting *Sierra Club v. Morton*, 405 U.S. 727, 735, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972)). Here, Kootenai Tribe and those joined with it allege that implementation of the Roadless Rule will make it more difficult to fight fires, increase disease of trees by blocking forest management and induce proliferation of harmful insects in the national forests. They allege that the Roadless Rule in these ways threatens aesthetic, recreational and spiritual enjoyment of national forest land by the Tribe and by the plaintiffs who are recreational users. This allegation is sufficient to satisfy the injury in fact requirement. *See Ecological Rights Found.*, 230 F.3d at 1149 ("Repeated recreational use itself, accompanied by a credible allegation of desired future use, can be sufficient, even if relatively infrequent, to demonstrate that environmental degradation of the area is injurious to that person."). Also, for the same reasons discussed in connection with the State of Idaho action, Boise Cascade and livestock companies, joined as plaintiffs in the Kootenai Tribe action, who have land adjacent to the national forests, have adequately shown injury in fact. The alleged injuries asserted by the Kootenai Tribe and other plaintiffs in its action are sufficient to satisfy the injury in fact requirement.[13]

### B. *Causation and Redressability*

■ Intervenors argue that even if the plaintiffs demonstrate a cognizable injury in fact, they cannot establish the requisite causal connection to the alleged NEPA violation. We disagree.

■ In NEPA cases, causation need only be established with "reasonable probability." *See Douglas County*, 48 F.3d at 1501 n. 6. As noted above, the district court had evidence that uncontrollable wildfires, the spread of insects and increased forest disease could result from the implementation of the Roadless Rule. This is sufficient to satisfy the causation requirement for both sets of plaintiffs.

■ The Intervenors further contend that a favorable decision of the court will not redress plaintiffs' alleged injuries because enjoining the Roadless Rule will not necessarily prevent the spread of wildfire, insects and forest disease. In cases of procedural injury, however, plaintiffs "need not demonstrate that the ultimate outcome following proper procedures will benefit them." *Cantrell*, 241 F.3d at 682; *see also Seattle Audubon Soc'y v. Espy*, 998 F.2d 699, 702 (9th Cir.1993); *Defenders of Wildlife*, 504 U.S. at 572 n. 7, 112 S.Ct. 2130. It is enough that a revised EIS may redress plaintiffs' alleged injuries.

### C. *Zone of Interests*

■ We have previously held that the protection of the environment falls within NEPA's zone of interests. *See Douglas County*, 48 F.3d at 1501; *see also City of Davis*, 521 F.2d at 672 ("the environmental interests [NEPA] seeks to protect are shared by all citizens."). Here, plaintiffs assert that the environmental health of their lands and the land they use for aesthetic, recreational or spiritual purposes will be threatened by implementation of the Roadless Rule. Plaintiffs' threatened interests fall within NEPA's interest in pre-

---

13. Intervenors claim that, even if plaintiffs demonstrate a threatened concrete interest, plaintiffs cannot demonstrate injury in fact because their alleged harm is speculative and not imminent. We disagree. Because the plaintiffs are alleging procedural violations, they "need not show that the substantive economic harm is imminent." *Cantrell*, 241 F.3d at 679 n. 3; *see also Defenders of Wildlife*, 504 U.S. at 572 n. 7, 112 S.Ct. 2130.

venting harm to the environment, and thus, their alleged injuries fall in the zone of interests that NEPA aims to protect. *See, e.g., Churchill County,* 150 F.3d at 1081. Plaintiffs have satisfied all the requirements of standing.

### V

Intervenors claim that, apart from standing, plaintiffs cannot assert a claim under the APA.[14] Intervenors argue that neither NEPA's EIS requirement nor NFMA's forest planning requirement[15] apply to the Roadless Rule, and hence its promulgation could not have been contrary to these laws. They argue that the Rule did not alter the natural physical environment and require an EIS under NEPA, and that the Rule was promulgated pursuant to the regulatory authority of the Forest Service's 1897 Organic Act, 16 U.S.C. § 551, which is outside the scope of the NFMA's forest planning requirements. We review de novo the question of whether NEPA and NFMA procedures apply to the Roadless Rule. *See Gorbach v. Reno,* 219 F.3d 1087, 1091 (9th Cir.2000) (en banc).

Under NEPA, a federal agency is required to prepare an EIS for all "major Federal actions significantly affecting the quality of the *human environment.*" 42 U.S.C. § 4332(2)(C) (emphasis added). "Human environment," in turn, is defined in NEPA's implementing regulations as "the natural and physical environment and the relationship of people with that environment." 40 C.F.R. § 1508.14. *See also Wetlands,* 222 F.3d at 1105. The disposi-

tive issue here is whether the Roadless Rule sufficiently affected the quality of the human environment to trigger the procedural requirements of NEPA.

We have explained that NEPA procedures do not apply to federal actions that maintain the environmental status quo. *See Burbank Anti–Noise Group v. Goldschmidt,* 623 F.2d 115, 116–17 (9th Cir.1981) (NEPA does not apply when an agency financed the purchase of an airport already built); *Nat'l Wildlife Fed'n v. Espy,* 45 F.3d 1337, 1343–1344 (9th Cir. 1995) (NEPA does not apply when agency transferred title to wetlands already used for grazing); *Bicycle Trails Council of Marin v. Babbitt,* 82 F.3d 1445, 1446 (9th Cir.1996) (closure of bicycle trails does not trigger EIS). In other words, "an EIS is not required in order to leave nature alone." *Douglas County,* 48 F.3d at 1505 (citation and internal quotation marks omitted). The touchstone of the EIS requirement is whether the change in the status quo is "effected by humans." *Id.* at 1506.

Here, both plaintiffs' and intervenors' arguments have some force. Plaintiffs argue that the decrease in development and the transition to less active management of the national forests that would result from the Roadless Rule constitute a change in the environmental status quo that will be effected by humans. In other words, plaintiffs argue that the decrease in forest management capabilities that will result from the Roadless Rule will likely have deleterious natural consequences (e.g., forest fires, insect infestation etc.), and that

---

**14.** Neither NEPA nor NFMA creates a private right of action and Plaintiffs brought their motions for a preliminary injunction relying upon the APA. *See* 5 U.S.C. § 702; *Oregon Natural Res. Council Action v. Bureau of Land Mgmt.,* 150 F.3d 1132, 1135 (9th Cir.1998).

**15.** The NFMA provides, in relevant part, that the Secretary issue regulations "to insure that land management plans are prepared in accordance with the [NEPA], including ... direction on when and for what plans an environmental impact statement ... shall be prepared...." 16 U.S.C. § 1604(g)(1).

the facilitation of those consequences is, in fact, a change in the environmental status quo.[16] Intervenors offer an equally compelling argument: that the Roadless Rule simply amounts to a decision to leave nature alone. As the intervenors view it, any changes in the environmental status quo that result from the Roadless Rule cannot be tied to human intervention, but rather to the lack thereof.

Because human intervention, in the form of forest management, has been part of the fabric of our national forests for so long, we conclude that, in the context of this unusual case, the reduction in human intervention that would result from the Roadless Rule actually does alter the environmental status quo. We agree with the district court that, accordingly, in promulgating the Roadless Rule, the Forest Service was required to adhere to the procedural requirements set forth in NEPA. By altering how the Forest Service manages inventoried roadless areas, the Roadless Rule will have a demonstrable impact on the physical environment. *See Metropolitan Edison Co. v. People Against Nuclear Energy*, 460 U.S. 766, 772, 103 S.Ct. 1556, 75 L.Ed.2d 534 (1983). The Forest Service's Roadless initiative thus required an EIS under NEPA.[17]

## VI

We next address whether the district court erred in issuing a preliminary injunction against the implementation of the Roadless Rule. We review the district court's grant of a preliminary injunction to determine if the district court abused its discretion or based its decision on an erroneous legal standard or clearly erroneous findings of fact. *Desert Citizens Against Pollution v. Bisson*, 231 F.3d 1172, 1176 (9th Cir.2000). *See also Gregorio T. v. Wilson*, 59 F.3d 1002, 1004 (9th Cir.1995).

To be entitled to preliminary injunctive relief, the plaintiffs must demonstrate either: (1) a combination of probable success on the merits combined with a possibility of irreparable injury; or (2) that serious questions are raised and the balance of hardships tips in plaintiffs' favor. *Idaho Sporting Cong. Inc. v. Alexander*, 222 F.3d 562, 565 (9th Cir.2000).

### A. Success on the Merits

The district court found that plaintiffs had shown probable success on the merits of their NEPA claim. We discuss the substantive grounds considered by the district court and reach a different conclusion.

### 1. Compliance with NEPA's Notice and Comment Procedures

It is settled that "NEPA is a procedural statute intended to ensure environmentally informed decision-making by federal agencies." *Tillamook County v. U.S. Army Corps of Eng'rs*, 288 F.3d 1140, 1142 (9th Cir.2002). For this reason, we have held that "NEPA 'does not mandate particular results,' but 'simply provides the necessary process' to ensure that federal agencies take a 'hard look' at the environ-

---

**16.** Plaintiff State of Idaho has argued that the Roadless Rule represents a shift by the Forest Service from a philosophy favoring active management of the national forests to one favoring conservation. The Roadless Rule indeed may herald a shift of emphasis by the Forest Service, but it is clear that both forest management and conservation are required by federal law. *See* NEPA, 42 U.S.C. §§ 4321

*et seq; see also* National Forest Management Act 16 U.S.C. 1604 *et seq.*

**17.** Because we hold that NEPA required that the Forest Service develop an EIS in this case, we need not and do not reach the issue whether the Roadless initiative required the Forest Service to prepare an EIS under NFMA.

mental consequences of their actions." *Muckleshoot Indian Tribe v. U.S. Forest Service,* 177 F.3d 800, 814 (9th Cir.1999) (quoting *Robertson v. Methow Valley Citizens Council,* 490 U.S. 332, 350, 109 S.Ct. 1835, 104 L.Ed.2d 351 (1989)).

██ To ensure that the Forest Service took a "hard look" at the consequences of the Roadless Rule initiative, the Forest Service was required to "involve the public in preparing and implementing their NEPA procedures." 40 C.F.R. § 1506.6(a); *see also* 5 U.S.C. § 553(c) (the Forest Service was under an obligation to afford "interested persons an opportunity to participate in the rule making."). NEPA regulations also required that the Forest Service invite the participation of affected state and local governments, as well as Indian Tribes. 40 C.F.R. § 1501.7(a)(1).[18]

Upon our review of the record, we are persuaded that the Forest Service did provide the public with extensive, relevant information on the Roadless Rule. We also conclude that the Forest Service allowed adequate time for meaningful public debate and comment.[19] Recognizing that the district court reached contrary conclusions on these and other issues, we will set forth, in some detail, the district court's reasoning and our views in response to the appeal and positions asserted by all parties.

██ As one ground for decision, the district court stressed its view that the Forest Service did not provide detailed maps or descriptions of potentially affected areas during both the scoping and DEIS comment period. As the district court saw it, the public was denied appropriate access to information that was reasonably necessary for its meaningful participation in the NEPA process. The district court credited the arguments of plaintiffs that maps were not made available during the scoping period and the maps that were made available during the DEIS notice and comment period were inadequate. But we are not persuaded that maps were required during the scoping period or that the maps provided during the DEIS notice and comment period suffered from the grave inadequacies alleged by plaintiffs.

First, plaintiffs overstate NEPA's requirements for the scoping period. The primary purpose of the scoping period is to notify those who may be affected by a proposed government action which is governed by NEPA that the relevant entity is beginning the EIS process; this notice requirement ensures that interested parties are aware of and therefore are able to participate meaningfully in the entire EIS process, from start to finish. *See Northwest Coalition for Alternatives to Pesti-*

---

**18.** A genuine commitment to scrutiny is required of the federal agency. It may not merely go through the motions. An agency's "[g]rudging, pro forma" compliance with these regulations violates NEPA's procedural safeguards. *See Block,* 690 F.2d 753 at 769 (internal quotations and citation omitted).

**19.** As Amicus, Attorney General of Montana, Mike McGrath commended what he described as "exemplary" public participation in the EIS process. McGrath noted more than 400 public meetings were held across the nation, including 24 in Montana. The Montana meetings were held in its largest cities and its smallest rural communities, permitting broad

public participation, with the result that more than 17,000 Montana citizens gave comments. He stressed that 67% of those in Montana who commented "favored even stronger protections for roadless areas than those proposed in the Draft EIS" and that "[n]ationally 96% of commenters favored stronger protections." In contrast to plaintiffs' challenge and the district court's view of the rulemaking as "pre-determined," the citizens of Montana, if we credit their Attorney General, believe to the contrary that the Roadless Rule is "the product of public rulemaking at its most effective."

*cides (NCAP) v. Lyng,* 844 F.2d 588, 594–95 (9th Cir.1988). Other purposes of the scoping period include narrowing the issues to receive in-depth treatment in the EIS and determining the range of actions, alternatives, and impacts to be addressed in the EIS. *See* Douglas O. Heiken, *The Pacific Yew and Taxol: Federal Management of an Emerging Resource,* 7 J. Envtl. L. & Litig. 175, 225–26 (1992); Dean B. Suagee, *The Application of the [National] Environmental Policy Act to "Development" in Indian Country,* 16 Am. Indian L.Rev. 377, 402–03 (1991). Beyond providing adequate notice and beginning a meaningful dialogue with members of the public about a proposed action, the affirmative duties NEPA imposes on a government agency during the scoping period are limited. *See* 40 C.F.R. § 1501.7. In this case, the Forest Service met its obligations under NEPA for the scoping period, and we disagree with the district court and plaintiffs that the Forest Service's failure to provide maps of the affected areas during this period violated NEPA.

 The Forest Service provided maps of the affected areas prior to issuing the DEIS. Moreover, the location of the affected areas was reasonably known to the plaintiffs prior to the receipt of the maps because the plaintiffs have been engaged in ongoing studies and discussions with the Forest Service about roadless areas for several years. Even if the maps provided in the DEIS and FEIS were less than ideal, plaintiffs cannot seriously dispute that they had actual notice as to the roadless areas that would be affected, by virtue of their prior contact with the Forest Service. This actual notice supplements notice from the maps provided to the public. Most importantly, the maps within the DEIS and FEIS in context gave reasonable notice of the roadless areas that would be affected by the rule. For the purposes of preliminary injunction analysis, we cannot say that the Forest Service's decision not to provide maps during the scoping period or that the alleged deficiencies in the maps provided prior to the DEIS demonstrate probable success on the merits of plaintiffs' NEPA claim.[20]

 The district court also was concerned about the fact that between publi-

**20.** Perhaps equally important is the principle that laws and regulations of general applicability may properly be considered by government officials who weigh and balance the virtues and defects of any prohibition or regulation. Laws of general applicability often must be fashioned in this way and do not require an evaluation of the costs and benefits of the law at each location where it may apply. The plaintiffs broadly assert that forest regulation must be made by local decision in the plans of each forest. Also, amici Washington Legal Foundation and Senators Larry E. Craig and Mark Dayton urge that the Roadless Rule is "a national-level override of the land use planning decision that individual forest plans made with respect to inventoried roadless areas of the National Forest System." There is some practical force in the contention that the Roadless Rule will override local forest-by-forest planning with regard to its intended scope. But nothing in the National Forest Management Act, which establishes procedures and standards for National Forest System land and resource management plans, precludes national action on a conservation issue within the power of the Forest Service. *See* 16 U.S.C. § 1604. Moreover, the general rulemaking authority of the 1897 Organic Act is sufficient to support the Roadless Rule's promulgation to achieve the objects of our National Forest System. *See* 16 U.S.C § 551; *see also McMichael v. United States,* 355 F.2d 283 (9th Cir.1965). Local considerations are taken into account in plans for each forest; but government, if it chooses to do so, may act more broadly. If the plaintiffs were correct in their premise, no general laws regulating air or water quality, for example, could be fashioned; emission or pollution standards would have to be assessed factory by factory, city by city, community by community and, as pertinent here, forest by forest.

cation of the DEIS, released May 2000, and the FEIS, released November 2000, the Forest Service identified an additional 4.2 million acres of previously unidentified inventoried roadless areas and subjected these acres to the proscriptions of the Roadless Rule. Plaintiffs argue that, as the public was not made aware of the location of the additional 4.2 million acres until after the DEIS comment period had passed, the public, at least as to these acres, could not meaningfully participate in the NEPA process. Thus, the argument runs, the public's participation was impaired by the fact that the Forest Service itself did not identify millions of acres of affected land until publication of the FEIS.

▪ It is true that a supplemental EIS must be published when an agency makes substantial changes in an EIS. *See* 40 C.F.R. 1502.9(c)(1) (when an agency "makes substantial changes in the proposed action that are relevant to environmental concerns," the public must be given additional opportunity to comment through publication of a supplemental EIS). However, a supplemental EIS is not required for *every* change; it is not uncommon for changes to be made in a FEIS after receipt of comments on a DEIS and further concurrent study.

Also, members of the public had every right and ability after publication of the FEIS on November 13, 2000, to comment further before adoption of the final Rule on January 12, 2001. Moreover, the alleged defect at most could affect the propriety of implementation of the Rule on the 4.2 million acres added during the process; it could not provide a proper basis to enjoin implementation of the Rule in all respects, particularly as applied to the acreage identified in the DEIS.

■ The district court also noted that public comment received on the proposed Rule had included expressions of concern

that Forest Service personnel were poorly informed and unable to adequately answer questions and describe the boundaries to affected acres. But the district court held no trial and made no findings of fact about the level of knowledge and preparation, for good or ill, of Forest Service staff involved in the public comment process. Mere griping or even serious complaints from a segment of the public are not sufficient to justify a judicial negation of the entire rulemaking process.

■ Also, plaintiffs argue that the Forest Service's failure to grant extensions of time is sufficient to justify the district court's finding of a likely NEPA violation. We disagree. The district court stressed that the FEIS is approximately 700 pages in length and is applicable to twenty-eight percent of National Forest Land Systems, a percentage which is equivalent to two percent of the land mass of the United States. The district court concluded that given the enormous impact of the Roadless Rule, it was not reasonable for the Forest Service to allow only 69 days for submission of public comment on the DEIS, concluding that "the comment period was grossly inadequate and thus deprived the public of any meaningful dialogue or input into the process—an obvious violation of NEPA."

■ We must respectfully disagree. The regulations implementing NEPA establish a minimum of only 45 days required for public comment. 40 C.F.R. § 1506.10(c). The 69 day period is more than 50% beyond the minimum. Whether still more time might have been beneficial to some parties is not the issue. When "the comment period ... last[s] substantially longer than the minimum 45 days required," the EIS ordinarily may not be challenged based on an allegedly inadequate comment period. *See County of Del*

*Norte v. United States,* 732 F.2d 1462, 1465 (9th Cir.1984); *State of Alabama ex rel. Siegelman v. United States EPA,* 911 F.2d 499, 506 (11th Cir.1990); *see also* 40 C.F.R. § 1506.10(d) (allowing the lead agency to extend prescribed periods and allowing the Environmental Protection Agency to reduce the 45 day period based on "compelling reasons of national policy"). If 69 days was not enough, what if it had been 80? Or 90? Or 120? We see no standard suggested by the district court for response time and no judicially manageable standard on this issue sufficient to permit a conclusion that public dialogue was precluded. The district court's suggestion that the public was deprived of "any meaningful dialogue or input into the process" is contradicted by the record which shows that the Forest Service held over 400 public meetings about the Roadless Rule and that it received over 1,150,-000 written comments. The Roadless Rule was also publicized by Forest Service distribution of 50,000 copies of the draft EIS, 43,000 copies of the EIS to the public, and sending of these documents to more than 10,000 public libraries as well as posting copies on a Forest Service Roadless Rule internet website.[21] Every comment received was sent to a special team of Forest Service employees that compiled, organized, and summarized the comments to permit presentation of a full range of viewpoints on the Roadless Rule.

■ It is true, as the district court noted, that "[t]he 45 day requirement for public comment under NEPA is statutorily contemplated as a minimum time frame to be set apart for meaningful disclosure and comment." *Idaho, ex rel. Kempthorne v. U.S. Forest Serv.,* 142 F.Supp.2d 1248, 1261 (D.Idaho 2001). However, the proposed invalidation of an agency action under NEPA when the lead agency provided

*substantially more* than the required 45 day minimum comment period prescribed by regulations is unprecedented. There are cases where government properly may work to deadline in seeking to advance the public's interest. Here, the foundations of the Roadless Rule concept were first studied in the 1970s; President Clinton's directive for a nationwide plan to protect roadless areas in national forests issued in October 1999; after a formal Notice of Intent and sixty days scoping period for public comment, and other proceedings, a DEIS was issued in May 2000 with 69 days for public comment; an FEIS was issued in November 2000, again permitting public comment; and the final Roadless Rule was issued on January 5, 2001.

The periods permitted for public comment exceeded regulatory minimums, and the entire process spanned over a year. NEPA requires that agencies give a hard look to environmental impact of proposed major actions, but not necessarily an interminably long look. We decline to affirm the district court's conclusion that plaintiffs have shown likely success on the merits based on a novel allegation that the periods for comment, though compliant with regulations, were too brief to permit meaningful comment.

We conclude that the district court erred in holding that the plaintiffs had shown likely success on the merits based on their allegation that the 69 day comment period deprived the public of information necessary for its meaningful participation in the NEPA process. *See Florida Power & Light Co. v. United States,* 846 F.2d 765, 771 (D.C.Cir.1988) (holding that, not only must an agency give adequate time for comments, but it also "must provide sufficient factual detail and rationale for the

21. The website was: http://www.road- less.fs.fed.us/

rule to permit interested parties to comment meaningfully").

## 2. *Consideration of a Reasonable Range of Alternatives*

 Plaintiffs allege that the alternatives to the Roadless Rule proposed by the Forest Service in the DEIS and FEIS were impermissibly narrow under NEPA. The district court held that the Forest Service failed to consider the full range of reasonable alternatives consonant with its policy objectives, stressing that the Forest Service considered only three viable alternatives, all of which included a total ban on road construction within roadless areas. We disagree with the district court's conclusion in this regard. We conclude that the DEIS and FEIS analyzed an adequate range of alternatives. The NEPA alternatives requirement must be interpreted less stringently when the proposed agency action has a primary and central purpose to conserve and protect the natural environment, rather than to harm it. Certainly, it was not the original purpose of Congress in NEPA that government agencies in advancing conservation of the environment must consider alternatives less restrictive of developmental interests. *See* 42 U.S.C. §§ 4231 *et seq.* The reason for a proper concern with alternatives here is that plaintiffs have urged that an excess of conservation will be harmful to the environment by precluding appropriate actions in developing roads useful for fighting fires, or insects, or other hazards.

Under NEPA, the Forest Service was under a mandate to "study, develop, and describe appropriate alternatives to recommended courses of action." 42 U.S.C. § 4332(E). The Forest Service was also required to include in its EIS a "detailed statement . . . on . . . alternatives to the proposed action." 42 U.S.C. § 4332(C)(iii). NEPA regulations describe this alternatives requirement as the "heart" of the EIS and require the agency to produce an IS that "[r]igorously explore[s] and objectively evaluate[s] all reasonable alternatives" so that the agency can "sharply defin[e] the issues and provid[e] a clear basis for choice among options by the decisionmaker and the public." 40 C.F.R. § 1502.14. In this case, the DEIS and FEIS considered three action alternatives for the inventoried roadless areas:[22] (1) prohibit road construction and reconstruction and allow timber harvest;[23] (2) prohibit road construction, reconstruction, and timber harvest except for stewardship purposes (e.g., disease, insect and fire prevention);[24] and (3) prohibit road construction, reconstruction, and all timber harvest within inventoried roadless areas.[25] The district court concluded that each of these three alternatives essentially "banned road construction and reconstruction in inventoried roadless areas and only differed as to the level of restriction imposed on timber harvesting." The district court was concerned that notably absent from the DEIS and FEIS was a consideration of alternatives that did not include a near-total, nationwide prohibition on road construction in inventoried roadless areas.

We disagree. We think that defendant-intervenors are correct in arguing that any inclusion of alternatives that allowed road construction outside of the few exceptions

---

**22.** The DEIS also considered a legally required no-action alternative.

**23.** This alternative would have reduced harvesting by 73 percent.

**24.** This alternative would have reduced harvesting by 85 percent.

**25.** This alternative would have prohibited all forms of timber harvest and reduced harvesting by 100 percent.

allowed in the Roadless Rule would be inconsistent with the Forest Service's policy objective in promulgating the Rule. That objective, as described by the Forest Service itself in the FEIS was to "prohibit[ ] activities that have the greatest likelihood of degrading desirable characteristics of inventoried roadless areas and [to] ensur[e] that ecological and social characteristics of inventoried roadless areas are identified and evaluated through local land management planning efforts." The Forest Service defined these values as, among other things, undisturbed landscapes, sources of water, biological diversity, protection against invasive species, and educational opportunities.

The district court also paid no heed to other interests asserted by intervenors such as FSEEE which, through its declarants, pointed out that there were inadequate funds available to maintain with safety existing Forest Service roads. The Roadless Rule ban would help ensure that adequate resources were available to keep existing roads in roaded areas safe. Stated another way, budget and safety considerations were offered by Forest Service to justify the Roadless Rule, in addition to the compelling environmental, conservation and wilderness values asserted by declarants and by Forest Service.

The district court's opinion, in our view, gives inadequate weight to analysis of the conservation and environmental values supporting the Rule and of the budgetary and safety considerations pertinent to it. All these values are worthy and they deserve consideration. As explained in the Final Rule, roadless areas contribute to the health of the public because they help preserve the forest system's watersheds, the rivers, streams, lakes, and wetlands that "are the circulatory system of ecosystems, and water is the vital fluid for inhabitants of these ecosystems, including people." The roadless areas also provide "important habitat for a variety of terrestrial and aquatic wildlife and plants, including hundreds of threatened, endangered, and sensitive species." Roadless areas in our national forests also help conserve some of the last unspoiled wilderness in our country. The unspoiled forest provides not only sheltering shade for the visitor and sustenance for its diverse wildlife but also pure water and fresh oxygen for humankind. In contrast, road construction and reconstruction facilitates forest management by timber harvest and possibly aiding fire prevention, but it is to a degree inimical to conservation. Given the importance of roadless lands as a resource and the ease with which they may be irretrievably damaged, and the amount of forest land already crossed by roads that facilitate active management of vast acreages, a near total ban on further road construction in the remaining and precious roadless areas within our national forests is not the drastic measure that the plaintiffs make it out to be. In contrast to the development of roads sought by plaintiffs, which may inevitably and finally alter the character of developed forest land, the Roadless Rule is benign in that it can be undone so that any development that has been forestalled under the rule may be resumed, or limited development may proceed under the exceptions it contemplates.

 The Forest Service was not required under NEPA to consider alternatives in the DEIS and FEIS that were inconsistent with its basic policy objectives. *Muckleshoot Indian Tribe v. U.S. Forest Serv.*, 177 F.3d 800, 813 (9th Cir.1999). Although plaintiffs are correct that the Forest Service could not "define its objectives in unreasonably narrow terms," *City of Carmel-by-the-Sea v. United States Dept. of Transp.*, 123 F.3d 1142, 1155 (9th Cir.1997), there is no indication that it did

so here. Protecting the roadless areas of our national forests from further degradation can hardly be termed unreasonably narrow. Moreover, given that the conservation and preventative goals of the Forest Service in promulgating the Roadless Rule are entirely consistent with the policy objectives of NEPA,[26] as well as with the Forest Service's own mission,[27] it would turn NEPA on its head to interpret the statute to require that the Forest Service conduct in-depth analyses of environmentally damaging alternatives that are inconsistent with the Forest Service's conservation policy objectives. *See, e.g., Or. Envtl. Council v. Kunzman,* 614 F.Supp. 657, 659–660 (D.Or.1985) (stating that the alternatives that must be considered under NEPA are those that would "avoid or minimize" adverse environmental effects); *see also Forelaws on Board v. Johnson,* 743 F.2d 677, 685 (9th Cir.1984) (suggesting that whether an agency's action comports with its statutory duty is relevant to whether the agency properly evaluated a range of alternatives under NEPA). While NEPA's procedural safeguards may be used to benefit those who assert development interests, just as the safeguards may be used to benefit those who assert conservation interests, *see, e.g., Am. Motorcyclist Assoc. v. Watt,* 714 F.2d 962 (9th Cir.1983), NEPA's policy objectives must not be thwarted in the process.

**26.** NEPA's policy objectives are set forth in 42 U.S.C. § 4331, which provides in pertinent part:

(a) Creation and maintenance of conditions under which man and nature can exist in productive harmony. The Congress, recognizing the profound impact of man's activity on the interrelations of all components of the natural environment, particularly the profound influences of population growth, high-density urbanization, industrial expansion, resource exploitation, and new and expanding technological advances and recognizing further the critical importance of restoring and maintaining environmental quality to the overall welfare and development of man, declares that it is the continuing policy of the Federal Government, in cooperation with State and local governments, and other concerned public and private organizations, to use all practicable means and measures, including financial and technical assistance, in a manner calculated to foster and promote the general welfare, to create and maintain conditions under which man and nature can exist in productive harmony, and fulfill the social, economic, and other requirements of present and future generations of Americans.

(b) Continuing responsibility of Federal Government to use all practicable means to improve and coordinate Federal plans, functions, programs, and resources. In order to carry out the policy set forth in this chapter, it is the continuing responsibility of the Federal Government to use all practicable means, consistent with other essential considerations of national policy, to improve and coordinate Federal plans, functions, programs, and resources to the end that the Nation may—

(1) fulfill the responsibilities of each generation as trustee of the environment for succeeding generations;

(2) assure for all Americans safe, healthful, productive, and esthetically and culturally pleasing surroundings;

(3) attain the widest range of beneficial uses of the environment without degradation, risk to health or safety, or other undesirable and unintended consequences;

(4) preserve important historic, cultural, and natural aspects of our national heritage, and maintain, wherever possible, an environment which supports diversity and variety of individual choice;

(5) achieve a balance between population and resource use which will permit high standards of living and a wide sharing of life's amenities; and

(6) enhance the quality of renewable resources and approach the maximum attainable recycling of depletable resources.

**27.** "The mission of the USDA Forest Service is to sustain the health, diversity, and productivity of the Nation's forests and grasslands to meet the needs of present and future generations." USDA Forest Service Web Page, *at* http://www.fs.fed.us/aboutus/mission.shtml.

■ As the case law and the statute itself reflect, the policy of NEPA is first and foremost to protect the natural environment. NEPA may not be used to preclude lawful conservation measures by the Forest Service and to force federal agencies, in contravention of their own policy objectives, to develop and degrade scarce environmental resources. The Forest Service, as steward of our priceless national forests, is in the best position, after hearing from the public, to assess whether current roads adequately aid forest management practices and whether a general ban on new roads in roadless areas of national forest serves appropriate conservation and budgetary interests.

■ The district court held that the Forest Service did not consider in the DEIS and FEIS less prohibitive restrictions that could have both protected roadless area values *and* permitted road construction that allowed for more active forest management. We conclude that this finding is clearly erroneous. The Forest Service's consideration of the three alternatives was adequate, and the selection of the preferred alternative does not appear to have been predetermined. Moreover, having considered additional alternatives in a preliminary manner, the Forest Service could reasonably conclude that only a near total ban on road construction in roadless areas could satisfy its policy objectives.

■ We conclude that the district court's determination that there was a strong likelihood that the Forest Service violated NEPA was not correct. Making this incorrect legal conclusion, the court compounded it by accepting only a minimal showing of irreparable harm. The court's view of the sliding scale standard was accurate but its assessment of likelihood of success on the merits, and hence degree of harm necessary for injunction, was not.

■ We also reject the district court's conclusion that the Forest Service failed adequately to evaluate the cumulative effects of the Roadless Rule and the potential mitigating measures. We agree with the defendant-intervenors that the potential cumulative effects of the Roadless Rule are too speculative to be amenable to in-depth analysis in the EIS. Similarly, we find the Forest Service's discussion of mitigating measures, with an extensive discussion of forest health and fire ecology, in the EIS to be adequate. Although plaintiffs urge that ills will ensue from the Roadless Rule, the situation is not black and white, and the balancing of all competing considerations is within the precise sphere of the Forest Service's expertise and mission. Access to roadless areas to prevent and control fires and to fight insect infestations may be more difficult under the Roadless Rule, but it will not be impossible.[28] We conclude that on the record before the court on the motions for preliminary injunction, it is plain that the Forest Service gave a "hard look" at the complex problem presented. Even if plaintiffs have shown a serious question of liability, it cannot be said that there is a strong likelihood of success on the merits.

---

**28.** The Roadless Rule expressly makes exception permitting road development and reconstruction when necessary to prevent imminent risks from fire or insect infestation, or to protect vested interests. If the district court after trial or other proceedings concludes that the exceptions are being administered improperly by the Forest Service, it will have the power to give any appropriate declaratory relief in view of the claims in issue. Litigation over the scope of these exceptions may provide a more precise way to tailor the Rule's application to local areas than the plaintiffs' attempt to enjoin the Rule's operation nationwide.

■ If plaintiffs had demonstrated a strong likelihood of success on the merits, then plaintiffs would have needed only to make a minimal showing of harm to justify the preliminary injunction. *See Idaho Sporting Cong. Inc.*, 222 F.3d at 565 (the stronger the probability of success on the merits, the less burden is placed on the plaintiffs to demonstrate irreparable harm); *Republic of the Philippines v. Marcos*, 862 F.2d 1355, 1362 (9th Cir.1988). That is how the district court analyzed the injunction standard after, in our view, giving too much credence to the substantiality of plaintiffs' claims. The converse side of the sliding scale is applicable. Where, as here, only a serious question of liability is presented, then for injunction, the plaintiffs must show that the balance of hardships tips decidedly in their favor. *Idaho Sporting Cong. Inc.*, 222 F.3d at 565. We turn to consider the assertions of irreparable injury by plaintiffs and the balance of hardships.

## B. *Balance of Hardships*

■ The intervenors argue that even if plaintiffs have shown probable success on the merits of their NEPA claims, the district court erred in issuing a preliminary injunction because the plaintiffs have not made the requisite showings that they will suffer "irreparable injury" and that they are favored by the balance of hardships.

■ In their status report to the district court, the Forest Service, now governed by a new presidential administration which is perhaps less sympathetic to the Roadless Rule, expressed concern "about the potential for irreparable harm in the longterm" caused by the Roadless Rule. Also, the district court made its own findings of irreparable injury based on the

record before it. The district court based its finding of irreparable harm on a General Accounting Office Report, which found that the Roadless Rule would prevent officials in (1) Payette National Forest in Idaho from implementing a forest-wide plan to restore pine forests; (2) Shasta Trinity National Forest in California from rebuilding old jeep trails to provide short-term access for fire prevention measures; and (3) Routt National Forest in Colorado from undertaking fire prevention measures. As noted above, there is an argument that the evidence suggested that implementation of the Roadless Rule would restrict active management activities that have already been planned and would thus preclude Forest Service officials from considering management techniques designed to prevent harms, such as wildfires, disease outbreaks and insect infestation. *See Forest Conservation Council v. U.S. Forest Serv.*, 66 F.3d 1489, 1496–98 (9th Cir. 1995) (ban of timber removal could cause state and county intervenors irreparable harm due to inability to undertake "their legal duties to protect the public safety by preventing and fighting wildfires"); *see also Northern Cheyenne Tribe v. Hodel*, 851 F.2d 1152, 1158 (9th Cir.1988) (cultural, social and economic harms to a tribe can constitute irreparable harm for purposes of NEPA injunction analysis).[29] But the argument is overstated.

This is an unusual case where an action, cessation of road development and repair in certain areas of our national forests, is being undertaken for the primary purpose of conservation, and the resulting benefit of the environment. There can be no serious argument that restrictions on human intervention in these wilderness areas will not result in immeasurable benefits from a

---

**29.** Although we grant Kootenai Tribe's request that we take judicial notice of the complaint in *Sierra Club v. Bosworth*, 199 F.Supp.2d 971 (N.D.Cal.2002), in light of the district court's decision in the case, we do not view that case as controlling for our analysis.

conservationist standpoint.[30] The question is whether the incidental harms that *may* result from such restrictions outweigh those benefits. We have already decided that, in a case such as this one where the purpose of the challenged action is to benefit the environment, the public's interest in preserving precious, unreplenishable resources must be taken into account in balancing the hardships. *See Am. Motorcyclist Assoc.*, 714 F.2d at 966. The district court in our view failed adequately to weigh the public interest in preserving our national forests in their natural state. In *Am. Motorcyclist Assoc.*, we affirmed the lower court's decision to deny a preliminary injunction, *in spite of* the plaintiffs' showing of a strong likelihood of success on the merits, in light of the overriding public interest in preserving the fragile desert environment. *Id.* Because we have concluded that the district court erred in holding that the plaintiffs in this case have shown a strong likelihood of success on the merits, the facts of this case weigh more strongly against injunctive relief.[31]

Moreover, as explained previously, restrictions on human intervention are not usually irreparable in the sense required for injunctive relief. Unlike the resource destruction that attends development, and that is bound to have permanent repercussions, restrictions on forest development and human intervention can be removed if later proved to be more harmful than helpful. Enforced inaction of the type we are presented with here poses no immediate threat of harm which must be forestalled. The fact that a three-year moratorium on road building was in place before the promulgation of the Roadless Rule makes plaintiffs' allegations of irreparable harm even harder to credit. Finally, and perhaps most importantly, the Forest Service's decision not to enforce the Roadless Rule until it has been amended after another full-scale notice and comment period makes plaintiffs' allegations of irreparable harm even more weak and questionable.[32]

The district court in substance concluded that the Forest Service likely violated

30. Many sensitive wildlife species—whether mammals, birds, reptiles, fish, insects or other organisms—make their homes in wild and roadless areas of forest, and can know no other life. Appellants Intervenors point out that many wildlife species that are hard-pressed for survival have final refuge in roadless areas. We cannot properly be unmindful of the fact that mountain lion, elk, wolverine, grizzly bears, wolves, and other threatened species need roadless areas to survive.

As for the forests themselves, which mankind itself needs to survive, they have not fared well in aggregate in recent decades. In a recent report, with comment on deforestation, the United Nations said 2.4 percent of the world's forests were destroyed during the 1990s; it estimated a total of 220 million acres of forest, an area larger that Venezuela, were lost. *See* United Nations Dep't of Econ. and Global Affairs, Global Challenge Global Opportunity: Trends in Sustainable Development 14, *available at* http://www.johannesburgsummit.org/html/documents/summit_

docs/criticaltrends_1408.pdf. In the United States, our National Forests already are both benefitted and burdened by extensive road development, some 380,000 miles of roads. Certainly, it is a policy decision for Congress and the responsible federal agencies such as the Forest Service to decide the proper balance for U.S. National Forests between conservation of wilderness and managed use that results in forest loss.

31. This is so even though the desert environment at issue in *Am. Motorcyclist Assoc.* was arguably more fragile than the national forests at issue here.

32. The Forest Service recently issued a news release regarding the Roadless Rule. *See* http://www.fs.fed.us/news/2002/06/roadless 06–26–02.htm. The Forest Service stated that it received 726,000 responses, mostly form letters, to its 10 questions presented in the Advanced Notice of Proposed Rulemaking, which will help determine amendments and changes to the Roadless Rule.

NEPA by promulgating the Roadless Rule on an expedited schedule that deprived the public of meaningful consideration and input. As explained, we hold that the process abided the general statutory requirements of NEPA and based on the preliminary evidence it cannot be said that plaintiffs have a strong likelihood of success on the merits. The district court incorrectly applied the "possibility of irreparable harm" standard to justify an injunction based on its incorrect assessment of likely success. Instead, given the uncertainty that plaintiffs' claims will be vindicated, the district court should have engaged in a more in-depth assessment of the balance of hardships, giving due weight to the public's interest in conservation of natural resources. Assessing the balance of hardships ourselves, we conclude that preliminary injunction should not issue.

## VII

Plaintiffs have demonstrated at best a serious question of liability on the merits of their NEPA claim, and plaintiffs cannot prevail at this stage when we assess prospects of irreparable harm to all parties and the balance of hardships that would flow from injunction. Because of its incorrect legal conclusion on prospects of success, the district court proceeded on an incorrect legal premise, applied the wrong standard for injunction, and abused its discretion in issuing a preliminary injunction.

**REVERSED AND REMANDED** for proceedings consistent with this opinion.

KLEINFELD, Circuit Judge, concurring in part and dissenting in part:

I concur in the majority's rejection of the Idaho Conservation League's [1] and the Forest Service Employees for Environmental Ethics' intervention of right under Rule 24(a) and with the holding that the plaintiffs have standing to pursue this action. I must part company with the majority, however, in its treatment of permissive intervention under Rule 24(b) and in its reversal of the preliminary injunction.

Under *Sports Form,*[2] we review preliminary injunctions only for abuse of discretion. It is not enough that we disagree with the district judge. We cannot reverse if we merely "would have arrived at a different result if[we] had applied the law to the facts of the case;" rather, we must conclude that "the district court relied on an erroneous legal premise or abused its discretion." [3] Such a determination cannot be made in this case.

### A. Permissive Intervention

The majority relies on Rule 24(b)(2), permitting intervention "when an applicant's claim or defense and the main action have a question of law or fact in common." There is no such commonality in this case.

The majority correctly recognizes that "private parties do not have a 'significant protectable interest' in NEPA compliance actions." [4] The majority quotes further from *Wetlands:* "The rationale for our rule is that, because NEPA requires action only by the government, only the government can be liable under NEPA. Because a private party can not violate NEPA, it

**1.** The Conservation League was joined by other environmental groups. For the sake of simplicity and readability, I will refer to them collectively as the Conservation League.

**2.** *Sports Form, Inc. v. United Press Int'l, Inc.,* 686 F.2d 750 (9th Cir.1982).

**3.** *Id.* at 752.

**4.** Majority Op. at 1108 (quoting *Wetlands Action Network v. United States Army Corps of Eng'rs,* 222 F.3d 1105, 1113–14 (9th Cir. 2000)).

can not be a defendant in a NEPA compliance action."[5] All perfectly correct so far.

What our precedent does not countenance is how the majority can conclude the Conservation League and the Employees have no "protectable interest" and "can not be a defendant in a NEPA compliance action," but somehow then find a "question of law or fact in common" with the main action. What, exactly, would that "common question" be? The District Court granted the injunction for failure to comply with NEPA. This is a NEPA compliance action. Our precedent clearly holds private parties have no protectable interest as defendants in NEPA compliance actions. In *Portland Audubon Society,* we held NEPA provided "no protection" for the would-be private intervenors.[6] We have reaffirmed the holding of *Portland Audubon Society* repeatedly.[7] How can NEPA, which offers "no protection" to the Conservation League and the Employees offer them a common "claim or defense" with the main action? I am mystified.

The majority admits that "the intervenors do not have an independent protectable interest."[8] The majority nevertheless claims the intervenors assert "defenses of the Roadless Rule directly responsive to the claim for injunction" and have "an interest in the use and enjoyment of road-

less lands."[9] This is plainly insufficient under Rule 24(b), which requires *common* claims or defenses, not merely parallel but distinct interests. The government's interest *in this action* is in compliance with the procedural requirements of NEPA, not in the enjoyment of national forests. The intervenors cannot possibly assert a claim or defense "common" with those asserted by the government defendants when the government is the only party bound by NEPA. The would-be intervenors have no claims or defenses at all—because they cannot be a defendant in a NEPA action— much less a claim or defense "common" to those of the government.

Essentially, the majority holds that as long as a would-be intervenor asserts a defense that is "responsive" to the claims against the proper party defendant, intervention is proper. The majority's position would allow intervention by virtually anyone who has some affected interest, for anyone can say "I agree that the government has this particular defense." Such a result is absurd and robs the "common question" provision of Rule 24(b) of any meaning. Standing and Rule 24(b) intervention are not the same, but the majority collapses them into one test. It is telling, but unsurprising, that the majority offers no precedent of any sort to support this expansive reading of Rule 24(b).[10]

---

5. Majority Op. at 1108 (quoting *Wetlands Action Network v. United States Army Corps of Eng'rs,* 222 F.3d 1105, 1114 (9th Cir.2000) (internal citations and quotations omitted)).

6. *Portland Audubon Society v. Hodel,* 866 F.2d 302, 309 (9th Cir.1989).

7. *Sierra Club v. EPA,* 995 F.2d 1478, 1485 (9th Cir.1993) (discussing intervention in NEPA case: "Since NEPA requires only action by the government, no private party can comply with NEPA. It is for that reason that in a lawsuit to compel compliance with NEPA, no one but the federal government can

be a defendant"); *Churchill County v. Babbitt,* 150 F.3d 1072, 1082–83 (9th Cir.1998), amended, 158 F.3d 491 (9th Cir.1998) (holding private intervenor properly rejected in merits phase of NEPA case and citing *Sierra Club* and *Portland Audubon* ); *Wetlands Action Network v. U.S. Army Corps of Engineers,* 222 F.3d 1105, 1114 (9th Cir.2000) (affirming denial of intervention by private party in merits phase of NEPA case and citing *Churchill County* ).

8. Majority Op. at 1110.

9. Majority Op. at 1111.

My disagreement with the majority is heightened by *Portland Audubon Society.* The majority cites *Portland,* but distinguishes it as applying only to intervention under Rule 24(a). The precedents do not support the majority's distinction. What the majority doesn't say is that the *Portland* panel relied entirely on a Seventh Circuit case, *Wade v. Goldschmidt.*[11] Although the *Portland* panel was not faced with the issue of permissive intervention in a NEPA case, the *Wade* court was, and squarely rejected it. "Thus, as it should be clear from our discussion of intervention of right it cannot be said that any of the applicants' claims or defenses and the present action have a question of law or fact in common as to satisfy the requirement for permissive intervention pursuant to Rule 24(b)(2)."[12]

*B. The Preliminary Injunction*

I, of course, would not reach the merits of this appeal as I believe intervention was improperly granted and the only proper defendant, the United States, did not appeal. Nevertheless, as the majority does reach the issue of the propriety of the injunction, I will respond to the majority's position. In the main, I agree with the numerous procedural problems in the implementation of the Roadless Rule identified by the district court, and would affirm for that reason, but I will point out some of the more egregious deficiencies.

The majority correctly notes that the Forest Service must consider alternatives to the proposed rule under NEPA, and appropriately recognizes that the regulations demand the Service produce a statement that "[r]igorously explore[s] and objectively evaulate[s] all reasonable alternatives."[13] The majority notes the stated objective of the Service was to "prohibit[ ] activities that have the greatest likelihood of degrading desirable characteristics of inventoried roadless areas." The so-called action "alternatives" offered by the Forest Service were: 1) ban road construction and repair but allow timber harvesting, 2) ban road construction and repair but allow timber harvesting only for stewardship purposes, and 3) ban road construction and repair and all timber harvesting. These "alternatives" differ only in how they handle timber harvesting; all of them ban road construction. They omit the obvious alternative of *not* banning road construction and repair. Thus the agency failed, as the district court found and the agency concedes, to give a "hard look" at all the alternatives.

The majority defends the "alternatives" offered by the Service on the ground that to offer other alternatives would have been "inconsistent" with the policy objectives of the Service. That contention is belied by the majority's own characterization of the Service's objective as preventing degradation of roadless areas. There are innumerable alternatives that would have met this objective. To name a few: allowing road construction with limits on density, allowing construction of roads made of certain materials only, or limiting use of the

---

**10.** There is precedent going the other way. *See EEOC v. Pan American World Airways,* 897 F.2d 1499, 1509–10 (9th Cir.1990) (when would-be intervenor's substantive rights terminated by EEOC action, no jurisdictional basis for permissive intervention). Here, the intervenors never had a right to defend the NEPA claim.

**11.** 673 F.2d 182 (7th Cir.1982) (per curiam).

**12.** *Id.* at 187.

**13.** 40 C.F.R. § 1502.14.

roads to low-emission vehicles. We have held previously, "The existence of a viable but unexamined alternative renders an environmental impact statement inadequate. An agency's consideration of alternatives is adequate if it considers an appropriate range of alternatives, even if it does not consider every available alternative." [14] The alternatives in this case do not meet that standard, and the alternatives requirement is "the heart of the environmental impact statement." [15] The majority writes as if the stated objective were banning roads in roadless areas. Such was not the case, and could not be the case under circuit precedent.[16] Roads may be necessary to protect the forests and those who have property affected by them from avoidable destruction by fire, insects, and disease.

The majority claims "The NEPA alternatives requirement must be interpreted less stringently when the proposed agency action has a primary and central purpose to conserve and protect the natural environment, rather than to harm it." No citation of authority for this proposition is provided. It makes no sense. The national forests were established to provide a source of timber and to protect the flow of water.[17] "National forests [at their creation] were not to be reserved for aesthetic, environmental, recreational, or wildlife-preservation purposes." [18] They are not

the same as wilderness areas, and the national forests are not "natural environments." They've been a managed rather than a natural environment for a hundred years. For most of that time they were managed to serve as a federal tree farm, supplying timber as a renewable resource. It also makes no sense to assume, as the majority opinion does, that roadlessness will "conserve and protect" the forests. The plaintiffs submitted evidence that roadlessness may promote forest fires, insect infestation, and disease.

NEPA also requires that the Service involve the public and allow interested persons an opportunity to comment.[19] As the majority states: "[the] notice requirement assures that interested parties are aware of and therefore are able to participate *meaningfully* in the *entire* EIS process, *from start to finish*." [20] Here, in an action involving *two percent of the land mass of this country*, the Service allowed a mere 69 day public comment period.[21] The district judge made a *finding of fact* that state maps of the affected area were not available until one month after the public comment period ended. Many responses were received in the final week, and the Service did not deign to respond. The documents offered to the public contained bizarre, Orwellian terms like "roaded roadless." To top it all off, 4.2 million acres

**14.** *Resources Ltd. v. Robertson*, 35 F.3d 1300, 1307 (9th Cir.1994) (internal citations and quotations omitted).

**15.** 40 C.F.R. § 1502.14.

**16.** *City of Carmel–by–the–Sea v. United States Dep't of Transp.*, 123 F.3d 1142, 1155 (9th Cir.1997) (agency may not define objective in "unreasonably narrow terms" to foreclose alternatives).

**17.** *United States v. New Mexico*, 438 U.S. 696, 707, 98 S.Ct. 3012, 57 L.Ed.2d 1052 (1978).

**18.** *Id.* at 708.

**19.** 40 C.F.R. § 1506.6(a); 5 U.S.C. § 553(c).

**20.** Majority Op. at 1116 (emphasis added).

**21.** The majority asks rhetorically how we might decide the precise number of days needed. Majority Op. at 1119. That is not the question before us. The question is whether 69 days was enough. Given the large land area in question, the 700 page

were added after the public comment period ended.

The District Court's factual findings are extensive and damning: "It appears from this record that the message disseminated during the development of the EIS was perceived by the public to be, at best, confusing and, at worst, inadequate. Public comment reflects concerns regarding the identity, and definition, of 'unroaded areas' and inventoried roadless areas; the inadequacy of information presented during the scoping process, including the inadequacy of the Forest Service Staff who conducted the public comment meetings during this process; the failure to engage in meaningful consultation with the Kootenai tribe; and the brief comment periods, and failure to grant reasonable requests for time ... *[T]he evidence is that the Forest Service did not, and in fact could not, provide such meaningful disclosure as descriptions and maps of the areas to be impacted by the rule were unavailable and Forest Service representatives were ill-prepared to answer the questions and concerns of the general public.*"[22]

As to the maps, the majority credits the government for providing them at all, even while noting they might have been "less than ideal." The "less than ideal" maps are forgiven by the majority because the plaintiffs had been in "ongoing studies and discussions with the Forest Service about roadless areas for several years." So, the majority argues, even if the maps were inadequate, the plaintiffs had "actual notice" of the areas to be affected. Our precedent is to the contrary. "Moreover, the procedural requirements prescribed in NEPA and its implementing regulations are to be strictly interpreted to the fullest extent possible in accord with the policies embodied in the Act. Grudging, pro forma compliance will not do."[23] Furthermore, a member of the Kootenai Tribe's Council provided an affidavit stating that a Forest Service representative spoke to the tribe only once, and at that visit could not tell the tribe the impact of the Roadless Rule on tribal rights or what they could expect when the rule was enacted. So much for the regulation requiring the Service to invite the participation of Indian Tribes.[24]

The district court did not abuse its discretion or clearly err on the facts in determining that the procedure followed by the government was "grossly inadequate." There is no basis for reversing the sound factual findings of the district court.

The district court was correct in its view that the plaintiffs had a strong likelihood of success on the merits, and was correct in concluding that the demonstration of harm sufficed to justify the injunction.[25]

The Roadless Rule does not preserve the status quo. It changes it, massively, for two percent of the entire land area of the United States. And by increasing the risk of forest fires, it threatens additional land and people, such as the Kootenai Tribe and the people of Idaho who brought this suit.

What we have here is a case where the agency attempted a massive management change for two percent of the nation's land on the eve of an election, and shoved it through without the "hard look" NEPA

---

FEIS, and the 1,600,000 comments received, it was not.

**22.** *Kootenai Tribe v. Veneman,* 142 F.Supp.2d 1231, 2001 WL 522031 at 15–17 (2001) (order) (emphasis added).

**23.** *California v. Block,* 690 F.2d 753, 769 (9th Cir.1982) (internal citations and quotations omitted).

**24.** 40 C.F.R. § 1501.7(a)(1).

**25.** *See Republic of the Philippines v. Marcos,* 862 F.2d 1355, 1362 (9th Cir.1988).

required, as the district court so found and the agency itself now acknowledges. The majority says, "No, it was a good enough look," but the agency prefers to take a harder look at all the alternatives. To the extent that policy preferences, for pristine wilderness, or fire suppression, or logging, or recreation, or anything else, bear on the issue, the elected organs of government ought to balance those interests. There is no justification for abandoning our precedents on intervention in NEPA actions in order to prevent the government from taking a harder look at a massive policy change.