**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| LOS PADRES FORESTWATCH; EARTH ISLAND INSTITUTE; CENTER FOR BIOLOGICAL DIVERSITY, *Plaintiffs-Appellants*, | No. 20-55859 |
| | D.C. No. 2:19-cv-05925-PJW |
| v. | |
| UNITED STATES FOREST SERVICE; KEVIN ELLIOTT, Supervisor, Los Padres National Forest; UNITED STATES FISH AND WILDLIFE SERVICE, *Defendants-Appellees*, | OPINION |
| AMERICAN FOREST RESOURCE COUNCIL; CALIFORNIA FORESTRY ASSOCIATION; ASSOCIATED CALIFORNIA LOGGERS, *Intervenor-Defendants-Appellees*. | |

Appeal from the United States District Court
for the Central District of California
Patrick J. Walsh, Magistrate Judge, Presiding

Argued and Submitted May 12, 2021
Pasadena, California

Filed February 4, 2022

Before:  Ryan D. Nelson and Kenneth K. Lee, Circuit
Judges, and Sidney H. Stein,* District Judge.

Opinion by Judge Stein;
Dissent by Judge R. Nelson

## SUMMARY**

### Environmental Law

The panel vacated the district court's summary judgment in favor of the U.S. Forest Service, and the Forest Service's Decision Memo approving the proposed Tecuya Ridge Shaded Fuelbreak Project; and remanded to the Forest Service to provide adequate substantiation for its determination that 21-inch dbh (diameter at breast height) trees are generally small diameter timber within the Project Area.

Tecuya Ridge is located within the Los Padres National Forest, and is home to densely populated forest stands that the Forest Service determined to be at risk of destruction by wildfire.  The Tecuya Ridge Project authorized thinning 1,626 acres of forest, including approximately 1,100 acres within a protected area called the Antimony Inventoried Roadless Area ("IRA").  The Roadless Area Conservation Rule was established in 2001 pursuant to a presidential

---

* The Honorable Sidney H. Stein, United States District Judge for the Southern District of New York, sitting by designation.

** This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

directive to initiate a nationwide plan to protect inventoried and uninventoried roadless areas within national forests. Generally, timber cutting, sale or removal in areas like the Antimony IRA are prohibited by the Roadless Area Conservation Rule. The Rule provides for some exceptions.

The panel held that the Forest Service's conclusion that the Tecuya Ridge Project was consistent with the Roadless Area Conservation Rule was arbitrary and capricious. The panel held that the Forest Service's determination that 21-inch dbh trees were "generally small timber" was arbitrary and capricious. The panel found no record evidence to support this determination. In addition, the Forest Service failed to articulate a satisfactory explanation – in the administrative record, in briefing, and at oral argument – for its determination that the 21-inch dbh trees in the Project area were "generally small" within the meaning of the Roadless Rule. Because the panel could not discern how the Forest Service arrived at the 21-inch dbh number, the panel remanded for the Forest Service to substantiate its conclusion that 21-inch dbh trees are "generally small" within the project area, consistent with the Roadless Rule.

The panel held that the Forest Service's determination that the Project will "maintain or improve" the Antimony Roadless Area's characteristics was not arbitrary and capricious. The Forest Service met its obligations under *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983), to articulate a satisfactory explanation for its action.

The panel held that the Forest Service's decision to "categorically exclude" the Tecuya Ridge Project from review in an environmental assessment or environmental impact statement, pursuant to the National Environmental

Policy Act ("NEPA"), was not arbitrary and capricious. First, the Forest Service's determination that Categorical Exclusion 6 ("CE-6") applied to the Project was not arbitrary and capricious. Second, the Forest Service's determination that no extraordinary circumstances prevented its application of CE-6 to the Project was not arbitrary and capricious. Consistent with 36 C.F.R. § 220.6, the Forest Service analyzed each resource condition – that should be considered in determining whether there were extraordinary circumstances related to the proposed action – and determined that the Project would have "no significant impact" on each. In addition, the Forest Service's decision to locate the Project in the "wildland zone" instead of the "threat zone" was not arbitrary and capricious because the Forest Service substantiated its decision with evidence in the record.

Judge R. Nelson dissented. He agreed with Sections I.B and II of the majority opinion. He wrote, however, that the majority wrongly held that the Forest Service's determination that 21-inch dbh trees are "small diameter" was arbitrary or capricious under the Administrative Procedure Act. He would deny the petition for review.

## COUNSEL

Justin Augustine (argued), Law Office of Justin Augustine, Oakland, California; Brian Segee, Center for Biological Diversity, Los Angeles, California; for Plaintiffs-Appellants.

Jeffrey S. Beelaert (argued), Bridget K. McNeil, and Sean C. Duffy, Attorneys; Jean E. Williams, Acting Assistant Attorney General; United States Department of Justice, Environment and Natural Resources Division, Washington, D.C.; for Defendants-Appellees.

Lawson E. Fite (argued) and Sara Ghafouri, American Forest Resource Council, Portland, Oregon, for Intervenor-Defendants-Appellees.

**OPINION**

STEIN, District Judge:

The Tecuya Ridge, part of the San Emigdio Mountain range, rises up from the Los Padres National Forest and overlooks the mountain communities of Lebec, Frazier Park, Lake of the Woods, Pine Mountain Club, and Pinon Pines Estates.  The Ridge falls within the Mt. Pinos Place Management Area, an environment forested with old-growth trees, including Singleleaf pinyon-California juniper and Montane conifer.  The area provides habitat for the California condor, the California spotted owl, and the northern goshawk and affords a scenic backdrop to the mountain communities nestled within it.  But because the Tecuya Ridge is home to densely populated forest stands,[1] the Forest Service has determined that both the forest and the adjacent mountain communities are at risk of destruction by wildfire.  To address this risk, the Forest Service proposed the Tecuya Ridge Shaded Fuelbreak Project (the "Project") in March 2018.  The Project aims to create a fuelbreak, a "wide strip or block of land on which the native or pre-existing vegetation has been permanently modified so that fires burning into it can be more readily extinguished,"[2] running roughly in a jagged line along the Tecuya Ridge.

---

[1] A "stand" is a "contiguous group of trees sufficiently uniform in age class distribution, composition, and structure, and growing on a site of sufficiently uniform quality, to be a distinguishable unit." *Reforestation Glossary*, U.S. Forest Serv., https://www.fs.fed.us/restoration/reforestation/glossary.shtml.

[2] U.S. Dep't of Agric., U.S. Forest Serv., *Land Management Plan: Part 3 Design Criteria for the Southern California National Forests* 96 (2005).

In April 2019, Los Padres Forest Supervisor Kevin Elliot published a Decision Memo approving the Project. Appellants Los Padres ForestWatch, Center for Biological Diversity, and Earth Island Institute filed a complaint challenging this decision on two grounds: that the Forest Service's approval of the project violates the National Environmental Policy Act of 1969 ("NEPA"), and that the Project authorizes logging large diameter trees in violation of the Roadless Area Conservation Rule. The parties filed cross-motions for summary judgment. The district court granted Appellee's motion for summary judgment and denied Appellants' motion for summary judgment. Appellants filed a timely notice of appeal on August 20, 2020.

Because the Forest Service has failed to explain how its decision to approve the Project complies with the requirements of the Roadless Area Conservation Rule, the Court vacates the district court's decision and the Forest Service's Decision Memo approving the Project and remands this case to the Forest Service to substantiate its conclusions.

## BACKGROUND

Since 1998, fifteen wildfires have burned through the Tecuya Ridge. The Forest Service believes that the risk of wildfire in that area remains high because the Tecuya Ridge consists of densely packed forest stands. Overcrowded stands are vulnerable to severe wildfire because they are full of tightly packed forest fuels—combustible forest materials—like shrubs, brush, and tree branches.[3] "Surface"

---

[3] U.S. Dep't of Agric., U.S. Forest Serv., *Influence of Forest Structure on Wildfire Behavior and the Severity of Its Effects* 1 (2003).

fuels lie on the forest floor, while "ladder" fuels allow wildfire to climb from the forest floor to the tree canopies.[4] The Forest Service has determined that surface and ladder fuel loads, dense tree crown cover, continued periods of drought, and the presence of trees ravaged by insects and disease in the Tecuya Ridge pose a risk of a wildfire with the potential to destroy an entire forest stand.

Accordingly, the Forest Service proposed the Tecuya Ridge Shaded Fuelbreak Project in March 2018. The Project Decision Memo explains that the Project aims to create a fuelbreak to "provide safe and effective locations from which to perform fire suppression operations," to "slow the spread of wildland fire," to "reduce the potential for the loss of life, property, and natural resources," and to "increase the forest's resilience to insects and diseases."

To accomplish these goals, the Project authorizes thinning 1,626 acres of forest, including approximately 1,100 acres within a protected area called the Antimony Inventoried Roadless Area ("IRA"). "Thinning," as explained in the Project Decision Memo, means that commercially viable trees will be cut down and mechanically harvested for commercial sale. Smaller trees and shrubs would either be treated by mastication—which means using equipment to grind, chip, or break apart brush and small trees into small pieces, leaving a "mulch" made from wood chips on the forest floor[5]—hand-thinning, or

---

[4] *Id*. at 2–3.

[5] U.S. Dep't of Agric., *Is Mastication Right For Your Site? Science-Based Decision Trees for Forest Managers*, Rocky Mountain Rsch. Station Sci. You Can Use Bull., Nov. 2020, at 1, *available at* https://www.fs.usda.gov/rmrs/sites/default/files/documents/SYCU_Is_Mastication_Right_for_Your_Site.pdf.

pruning. Any fuels created by these activities would be scattered or piled by hand on the forest floor and burned. The vast majority of the trees targeted for treatment will be commercially logged and sold.

On March 13, 2018, the Forest Service issued a Project Proposal for the Tecuya Ridge Shaded Fuelbreak Project and a letter soliciting public comment on the proposal. Between April 2018 and April 2019, Appellants and other interested parties submitted comments to the Forest Service, raising concerns, among others, that the Project violated 1) NEPA by authorizing the sale of commercial wood products pursuant to a categorical exclusion, and 2) the Roadless Area Conservation Rule by authorizing commercial logging in the Antimony IRA.

In April 2019, Los Padres Forest Supervisor Kevin Elliot published a Decision Memo approving the Project. The Decision Memo explained that the Forest Service had considered the public's concern regarding "impacts to wildlife, the Antimony IRA, and the commercial sale of timber and other wood products" but had determined that the Project would not "imperil species of concern."

Appellants filed a complaint challenging the Forest Service's decision to approve the Project on the grounds that the decision violated the Roadless Area Conservation Rule and NEPA. The district court granted Appellee's motion for summary judgment and denied Appellants' motion for summary judgment on August 20, 2020. This appeal followed.[6]

---

[6] Appellants assert they have associational standing to bring this suit. Appellees have not contested this. Nevertheless, Appellants have

**STANDARD OF REVIEW**

Appellate courts "review a grant of summary judgment de novo." *Gardner v. U.S. Bureau of Land Mgmt.*, 638 F.3d 1217, 1220 (9th Cir. 2011) (citing *Swanson v. U.S. Forest Serv.*, 87 F.3d 339, 343 (9th Cir. 1996)).

Courts review agency decisions under NEPA and the Roadless Area Conservation Rule under the standards set out in the Administrative Procedure Act ("APA"), and "must set aside agency action found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Idaho Sporting Cong., Inc. v. Rittenhouse*, 305 F.3d 957, 964 (9th Cir. 2002) (citing 5 U.S.C. § 706).

**ANALYSIS**

**I.  The Forest Service's Conclusion that the Tecuya Ridge Project Is Consistent with the Roadless Area Conservation Rule Is Arbitrary and Capricious.**

The Roadless Area Conservation Rule was established in 2001[7] pursuant to a presidential directive to "initiate a

---

associational standing—the right to bring a suit on behalf of their members—because their "members would have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires individual members' participation in the lawsuit." *Friends of the Earth, Inc. v. Laidlaw Env'tl Servs. (TOC), Inc.*, 528 U.S. 167, 169 (2000) (citing *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977)).

[7] The 2001 Roadless Rule has a somewhat complex history. The rule was enjoined before it went into effect, and the Forest Service promulgated an alternative rule, *see* Special Areas; State Petitions for Inventoried Roadless Area Management, 70 Fed. Reg. 25,654–55 (May

nationwide plan to protect inventoried and uninventoried roadless areas" within national forests. *Kootenai Tribe of Idaho v. Veneman*, 313 F.3d 1094, 1105 (9th Cir. 2002). In promulgating the rule, the Forest Service identified 58.5 million acres of "inventoried roadless areas," including the Antimony IRA. *See id*.

An "Inventoried Roadless Area" ("IRA") is an area that "provide[s] large, relatively undisturbed landscapes that are important to biological diversity and the long-term survival of many at risk species." Special Areas; Roadless Area Conservation, 66 Fed. Reg. 3,244, 3,245 (Jan. 12, 2001); *see also* 36 C.F.R. § 294.11. The Antimony IRA, forested with pinyon pine, other conifers, and sagebrush, spans nearly 40,513 acres across the San Emigdio Mountain range. Twenty-four miles long and three miles wide, it lies both north of and adjacent to the San Andreas Rift Zone. The ridge tops of Antimony provide expansive views of the southern San Joaquin Valley. The Antimony IRA also provides habitat for California condors, which, according to the Final Supplemental Environmental Impact Statement for the Southern California National Forests Land Management Plan Amendment, use the area "extensively for travel and roosting as they soar on uplifted winds along the southern boundary of the San Joaquin Valley."

The Project authorizes thinning, including commercial thinning, of approximately 1,100 acres of forest within the Antimony IRA. Generally, timber cutting, sale, or removal

---

13, 2005), which is still codified at 36 C.F.R. § 294. However, the Ninth Circuit affirmed the judgment of a district court setting aside the alternative rule, and reinstating the original 2001 rule, in 2009. *See California ex rel. Lockyer v. U.S. Dep't of Agric.*, 575 F. 3d 999, 1021 (9th Cir. 2009). The version of the Rule at issue in this case is the original 2001 version.

in areas like the Antimony IRA are prohibited by the Roadless Area Conservation Rule because those activities "have the greatest likelihood of altering and fragmenting landscapes, resulting in immediate, long-term loss of roadless area values and characteristics." Special Areas; Roadless Area Conservation, 66 Fed. Reg. at 3,244. But the Rule provides for some exceptions. For instance, "[t]imber may be cut, sold, or removed in inventoried roadless areas" if the Responsible Official determines:

> (1) The cutting, sale, or removal of generally small diameter timber is needed for one of the following purposes and will maintain or improve one or more of the roadless area characteristics as defined in § 294.11.
>
> (i) To improve threatened, endangered, proposed, or sensitive species habitat; or
>
> (ii) To maintain or restore the characteristics of ecosystem composition and structure, such as to reduce the risk of uncharacteristic wildfire effects, within the range of variability that would be expected to occur under natural disturbance regimes of the current climatic period[.]

36 C.F.R. § 294.13.

The rule defines "roadless area characteristics" as "[r]esources or features that are often present in and characterize inventoried roadless areas," including:

(1) High quality or undisturbed soil, water, and air;

(2) Sources of public drinking water;

(3) Diversity of plant and animal communities;

(4) Habitat for threatened, endangered, proposed, candidate, and sensitive species and for those species dependent on large, undisturbed areas of land;

(5) Primitive, semi-primitive non-motorized and semi-primitive motorized classes of dispersed recreation;

(6) Reference landscapes;

(7) Natural appearing landscapes with high scenic quality;

(8) Traditional cultural properties and sacred sites; and

(9) Other locally identified unique characteristics.

36 C.F.R. § 294.11.

Thus, "[w]hether the [Forest] Service may harvest timber in an inventoried roadless area is a three-step inquiry." *All. for the Wild Rockies v. Krueger*, 950 F. Supp. 2d 1196, 1214 (D. Mont. 2013), *aff'd sub nom. All. for the Wild Rockies v. Christensen*, 663 F. App'x 515 (9th Cir. 2016). "First, the timber to be harvested must be 'generally small diameter.' Second, the harvest must be needed for one of two listed purposes [as defined in 36 C.F.R. § 294.13]. Third, the harvest must maintain or improve one or more of the roadless area characteristics as defined in § 294.11." *Id.*

The Forest Service concluded that the Project complies with the Roadless Rule because it seeks to reduce the risk of uncharacteristic wildfire effects, a purpose specifically identified in 36 C.F.R. § 294.13, may be needed for recovery or conservation of threatened, endangered, proposed, or sensitive species, a roadless area characteristic identified in 36 C.F.R. § 294.11, and removes generally smaller trees with a diameter of less than 21 inches at breast height ("dbh") within the Antimony IRA. Appellants, however, argue that the Forest Service has failed to substantiate its assertion that trees measuring 21-inches dbh are "generally small diameter timber" or explain how the Project will maintain or improve one of the "roadless area characteristics" listed in 36 C.F.R. § 294.11.

The Court disagrees with Appellants on the latter contention and finds that the Forest Service has adequately explained its determination that the Project will maintain or improve one of the roadless area characteristics listed in 36 C.F.R. § 294.11. For instance, the fourth characteristic covers the "[h]abitat for threatened, endangered, proposed, candidate, and sensitive species" and the Forest Service's Decision Memo finds that "[t]he project would benefit California condors by treating fuels to help prevent large,

high intensity stand replacement wildland fire that could eliminate roosting habitat over a larger area."

But because the Forest Service has indeed failed to explain its determination that 21-inch dbh trees are "generally small diameter timber" within the meaning of the Roadless Rule, its decision to approve the Project was arbitrary and capricious.

### A. The Forest Service's Determination that 21-inch dbh Trees Are "Generally Small Diameter Timber" Is Arbitrary and Capricious.

"The intent of the [Roadless Area Conservation Rule] is to limit the cutting, sale, or removal of timber to those areas that have become overgrown with smaller diameter trees." Special Areas; Roadless Area Conservation, 66 Fed. Reg. at 3,257. In promulgating the Rule, the Forest Service specifically chose not to define "what constitutes 'generally small diameter timber'" because "[s]uch determinations are best made through project specific or land and resource management plan NEPA analyses," as guided by certain ecological considerations. *Id*.

Risk of fire is one of these considerations. The Forest Service noted that "areas that have become overgrown with shrubs and smaller diameter trees creating a fuel profile that acts as a 'fire ladder' to the crowns of the dominant overstory trees may benefit ecologically from thinning treatments that cut and remove such vegetation." *Id*. The notice of adoption of the final version of the Rule specifically explains that "[t]hinning of small diameter trees, for example, that became established as the result of missed fire return intervals due to fire suppression and the condition of which greatly increases the likelihood of uncharacteristic wildfire effects," is permissible under the Rule. *Id.*

The Project permits mechanical thinning of trees less than 21-inches dbh inside the Antimony IRA to prevent uncharacteristic wildfire effects.  The Forest Service contends that trees less than 21-inches dbh are "generally small diameter timber" consistent with 36 C.F.R. § 294.13. But the Court finds no evidence in the record to support the Forest Service's determination.

An agency must "articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)).  "Even when an agency explains its decision with 'less than ideal clarity,' a reviewing court will not upset the decision on that account 'if the agency's path may reasonably be discerned.'" *Alaska Dep't of Env'tl Conservation v. EPA*, 540 U.S. 461, 497 (2004) (quoting *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974)).  However, an agency's determination is arbitrary and capricious where it merely provides "generic statements" to support its conclusion in lieu of evidence that it has actually applied its substantive expertise. *Or. Nat. Desert Ass'n v. Rose*, 921 F.3d 1185, 1191 (9th Cir. 2019).  The Court "cannot defer to a void." *Or. Nat. Desert Ass'n v. U.S. Forest Serv.*, 957 F.3d 1024, 1035 (9th Cir. 2020) (internal quotation marks omitted) (quoting *Or. Nat. Desert Ass'n v. Bureau of Land Mgmt.*, 625 F.3d 1092, 1121 (9th Cir. 2010)).

The Forest Service has failed to articulate a satisfactory explanation—in the administrative record, in briefing, and at oral argument—for its determination that the 21-inch dbh trees that inhabit the Project area are "generally small" within the meaning of the Roadless Rule.  Problematically,

the Forest Service fails to provide evidence of the average or median dbh of the trees within the Tecuya Ridge Project area at all. It is impossible to tell, from the record, which size classes of trees inhabit the Project area and whether 21-inch dbh trees can properly be considered "small" within those classes. Instead, the Decision Memo approving the Project merely contains a bare assertion—with no supporting analysis—that the 21-inch dbh trees are "smaller trees" consistent with the Roadless Area Conservation Rule.

The Briefing Paper accompanying the Decision Memo, which references the Los Padres Land Management Plan, also fails to provide clarity. The Los Padres Land Management Plan defines large-diameter trees as those of over 24-inches dbh. The Forest Service appears to argue that any tree with a dbh of less than 24 inches can be considered a "generally small diameter tree." But the Court cannot determine why, in the Forest Service's view, the difference between a "generally small" tree and a "large-diameter tree" is merely three inches dbh because the Forest Service has failed to provide any information that would help the Court to do so. Indeed, the Land Management Plan's declaration that 24-inch dbh trees are large-diameter trees leads the Court to conclude that a 21-inch dbh tree is, at best, a medium-sized tree, not a "generally small" tree as contemplated by the Roadless Rule.

Other evidence available in the record tends to confirm that trees of up to 21-inches dbh are not "generally small." In an Environmental Assessment for another nearby project, the Frazier Mountain Project, the Forest Service noted that "larger diameter" trees were those with a dbh greater than ten inches. Although the Forest Service contends that the Frazier Mountain Project Environmental Assessment is irrelevant here because that project thinned timber stands

primarily overstocked with different tree species—Jeffrey pine—the Court is not convinced. Jeffrey pine, a type of coniferous tree, is a component of mixed-conifer forests and a type of tree found within the Tecuya Project area. Because the Frazier Project area is located in close proximity with the Tecuya Ridge Project area and likely contains a similar stand composition, the Forest Service has failed to justify its determination that "larger diameter" trees in the Frazier Project area have a dbh greater than ten inches while "small diameter" trees in the Tecuya Ridge Project area have a dbh of up to 21 inches.

Even assuming that the stand composition in the Frazier Mountain Project area differs substantially from the stand composition in the Tecuya Ridge Project area, the Forest Service has failed to provide any data comparing the average dbh of trees within the Frazier Mountain Project area with the average dbh of trees in the Tecuya Ridge Project area to support its conclusion that "small" trees in the Tecuya Ridge are much larger than even the "large" trees on Frazier Mountain. If the Forest Service had shown that trees on Frazier Mountain have a generally smaller dbh on average than the mixed conifer and pinyon-juniper trees on the Tecuya Ridge, the Court might have deferred to its determination that trees of up to 21 dbh in mixed conifer and pinyon-juniper dominated stands in the Project area are properly considered "small." But the Forest Service did not attempt to articulate this explanation or, indeed, provide any information at all on the average dbh of the trees located within the Tecuya Project area.

In attempting to support its determination that the Project Decision Memo complies with the Roadless Rule, the Forest Service notes that the Roadless Rule's definition of generally small timber is "flexible" and allows Forest Service experts

to determine what timber is "generally small" based on project-specific goals and ecological considerations. It argues that 21-inch dbh trees must be removed within the Project area to "meet the desired conditions of the proposed [Project] to a 90 percent effective level," and urges the Court defer to its "technical expertise." But although the Forest Service may indeed apply its technical expertise to determine which "generally small" trees pose an uncharacteristically high risk of fire spread and intensity, *see* Special Areas; Roadless Area Conservation, 66 Fed. Reg. at 3,257, the Forest Service provides no evidence that it has actually performed the technical analysis necessary to identify them.

For instance, the Decision Memo for the Project states that the Forest Service conducted "stand exams" in the project area, "coupled with walk-throughs by Forest professionals and data from other sources," which "confirm that existing stand density and structure put the area at risk from insects and disease, as well as from wildfire." But this proclamation pertains solely to the Forest Service's rationale for the Project—it does not substantiate the Forest Service's determination that 21-inch dbh trees are "generally small" or why 21-inch dbh trees, specifically, are creating the risk of wildfire the Project seeks to ameliorate. In fact, the Forest Service has never explained what a "stand exam" or "walk-through" entails, and how the data gleaned from those activities helped it to determine that the Project complies with the Roadless Rule. By failing to explain why 21-inch dbh trees are the type of "generally small trees" the Roadless Rule permits the Forest Service to harvest, the Forest Service has failed to show that it has complied with the intent of the Roadless Rule to "limit the cutting, sale, or removal of timber to those areas that have become overgrown with

smaller diameter trees."    Special Areas; Roadless Area Conservation, 66 Fed. Reg. at 3,257.

To be clear, the Court does not require the Forest Service to undertake any particular method of providing a reasoned explanation for its choice to designate trees of up to 21-inches dbh as "generally small." The United States Supreme Court has continually affirmed that "agencies should be free to fashion their own rules of procedure." *Vermont Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 544 (1978). "[A] reviewing court may not, after determining that additional evidence is requisite for adequate review, proceed by dictating to the agency the methods, procedures, and time dimension of the needed inquiry." *Fed. Power Comm'n v. Transcon. Gas Pipe Line Corp.*, 423 U.S. 326, 333 (1976). But where "the decision of the agency 'is not sustainable on the administrative record made, then the . . . decision must be vacated and the matter remanded . . . for further consideration." *Id.* at 331 (quoting *Camp v. Pitts*, 411 U.S. 138, 143 (1973)).

The Forest Service's determination that the Project is consistent with the Roadless Area Conservation Rule is not sustainable on the current administrative record. The Court cannot discern how the Forest Service arrived at the 21-inch dbh number. The Court thus remands this case to the Forest Service to substantiate its conclusion that 21-inch dbh trees are "generally small" within the project area, consistent with the Roadless Rule. *See Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1214 (9th Cir. 1998) (finding the Forest Service's decision to be arbitrary and capricious where the EA "contain[ed] virtually no references to any material in support of or in opposition to its conclusions").

**B. The Forest Service's Determination that the Project Will "Maintain or Improve" the Antimony Roadless Area's Characteristics Is Not Arbitrary and Capricious.**

Appellants further allege that the Forest Service violated 36 C.F.R. § 294.13 of the Roadless Rule by failing to provide "any explanation at all" to establish that the logging of 21-inch dbh trees will "maintain or improve one or more of the roadless area characteristics as defined in § 294.11." But in this case, the Forest Service has met its obligations under *State Farm* to "articulate a satisfactory explanation for its action including 'a rational connection between the facts found and the choice made.'" *State Farm Mut. Auto. Ins. Co.*, 463 U.S. at 43 (quoting *Burlington Truck Lines*, 371 U.S. at 168).

The Forest Service avers that the Project will maintain or improve habitat conditions for threatened, endangered, proposed, candidate, and sensitive species, a roadless area characteristic defined by 36 C.F.R. § 294.11. That assertion is substantiated in the Decision Memo for the Project, which includes the Forest Service's determination that "in some situations, cutting or removal of small diameter timber [in the Project area] may be needed for recovery or conservation of threatened, endangered, proposed or sensitive species to improve stand structure or reduce encroachment into meadows or other natural openings." For instance, the California condor, an endangered species, frequently flies over the Project area and may use the Project area to roost or nest. The Forest Service concluded that the Project "would benefit California condors by treating fuels to help prevent large, high intensity stand replacement wildland fire that could eliminate roosting habitat over a larger area" and might "improve condor foraging habitat by creating a more

open area that facilitates finding and catching prey by birds like condors that are dependent upon sight for locating food."

The Project area also contains two sensitive botanical species, Hall's Woolly Sunflower and Flaxleaf Monardella. In its Botany Report for the Project, the Forest Service concluded that the Project would maintain or improve habitat suitability for both of these species because the Project will reduce the "risk of mortality from moderate to high intensity wildfires." In addition, it concluded that reducing stand density may provide indirect beneficial impacts for these species because the Project will create or maintain open areas which may provide additional suitable habitat. On this record, the Forest Service's determination that the Project will maintain or improve at least one of the Antimony Roadless Area's characteristics was not arbitrary and capricious.

## II. The Forest Service's Decision to "Categorically Exclude" the Tecuya Ridge Project from Review in an EA or EIS Was Not Arbitrary and Capricious.

Appellants further contend that the Forest Service's decision to approve the Project violated NEPA. First, Appellants argue that the Forest Service improperly authorized the Project pursuant to a Categorical Exclusion. Second, Appellants argue that the Forest Service's decision to categorically exclude the Tecuya Ridge Project from Review in an EA or EIS was arbitrary and capricious because the Forest Service failed to analyze fuelbreak efficacy as an "extraordinary circumstance" that would prevent it from applying a Categorical Exclusion to the Project.

**A. The Forest Service's Determination that CE-6 Applies to the Project Is Not Arbitrary and Capricious.**

NEPA, 42 U.S.C. § 4321 *et seq.*, "declares a broad national commitment to protecting and promoting environmental quality." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 348 (1989). It mandates federal agencies to prepare an environmental impact statement ("EIS") for proposed "[f]ederal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C). This statutory requirement ensures that federal agencies thoroughly consider "detailed information concerning significant environmental impacts" before approving certain actions and that they make this information "available to [a] larger audience that may also play a role in both the decisionmaking process and the implementation of that decision." *Robertson*, 490 U.S. at 349.

To effectuate these requirements, Congress established a Council on Environmental Quality (CEQ), which promulgates "binding regulations implementing the procedural provisions of NEPA." *Id.* at 354; 42 U.S.C. § 4344(4). CEQ regulations allow an agency to first prepare an environmental assessment ("EA") for a proposed project to determine whether the environmental impact of the project is "significant enough to warrant preparation of an EIS." *Blackwood*, 161 F.3d at 1212 (citing 40 C.F.R. § 1508.9).

But an agency may avoid preparing either an EA or an EIS altogether by determining that a proposed action fits within certain "categorical exclusions." 40 C.F.R. § 1508.4. A "Categorical Exclusion" ("CE") is an action which a federal agency has found "do[es] not individually or

cumulatively have a significant effect on the human environment." *Id.* Normally, proposed actions that fit within a categorical exclusion do not require an agency to prepare either an environmental impact statement or an environmental assessment. *Id.*

In approving the Tecuya Ridge Project, the Forest Service determined that Categorical Exclusion 6 (CE-6) applied and exempted the Project from review in an EA or EIS. CE-6 applies to "[t]imber stand and/or wildlife habitat improvement activities that do not include the use of herbicides or do not require more than 1 mile of low standard road construction," which may include activities such as:

    i.    Girdling trees to create snags;

    ii.    Thinning or brush control to improve growth or to reduce fire hazard including the opening of an existing road to a dense timber stand;

    iii.    Prescribed burning to control understory hardwoods in stands of southern pine; and

    iv.    Prescribed burning to reduce natural fuel build-up and improve plant vigor.

36 C.F.R. § 220.6(e)(6).

Appellants challenge this action, contending that CE-6 does not apply to the Tecuya Ridge Project because CE-6 permits only precommercial thinning and the Project authorizes commercial thinning. The Forest Service believes that CE-6 applies to the Tecuya Ridge project because the Project does not include the use of herbicides or

require road construction and because thinning is a timber stand improvement activity.  The Forest Service interprets CE-6 to allow it to commercially thin trees, as long as the commercial thinning is used to accomplish forest improvement activities.

We do not decide this question here.  In the related case *Mountain Communities for Fire Safety, Los Padres ForestWatch, and Earth Island Institute v. Kevin Elliott and the United States Forest Service*, No. 20-55660 (9th Cir. Feb. 4, 2022), this Court agreed with the Forest Service's reading of CE-6.  Therefore, the sole remaining question before the Court is whether the Forest Service's decision to apply CE-6 to the Project was arbitrary and capricious because it failed to analyze fuelbreak efficacy as a potential "extraordinary circumstance" that would prevent application of *any* CE to the Project.

**B. The Forest Service's Determination that No Extraordinary Circumstances Prevent its Application of CE-6 to the Project Is Not Arbitrary and Capricious.**

Even if a proposed project fits within a CE category, the Forest Service cannot opt out of further analysis and documentation in an EA or EIS unless "there are no extraordinary circumstances related to the proposed action." 36 C.F.R. § 220.6(a).  An "extraordinary circumstance" is a circumstance "in which a normally excluded action may have a significant environmental effect."    40 C.F.R. § 1508.4. 36 C.F.R. § 220.6(b) provides that:

> (1) Resource conditions that should be considered in determining whether extraordinary circumstances related to a proposed action warrant further analysis

and documentation in an EA or an EIS are:

(i)      Federally listed threatened or endangered species or designated critical habitat, species proposed for Federal listing or proposed critical habitat, or Forest Service sensitive species;

(ii)     Flood plains, wetlands, or municipal watersheds;

(iii)    Congressionally designated areas, such as wilderness, wilderness study areas, or national recreation areas;

(iv)     Inventoried roadless area or potential wilderness area;

(v)      Research natural areas;

(vi)     American Indians and Alaska Native religious or cultural sites; and

(vii)    Archaeological sites, or historic properties or areas.

36 C.F.R. § 220.6(b).

In addition to these resource conditions, Appellants contend that the Forest Service should have analyzed the Project's impacts to public safety as an additional

"extraordinary circumstance." Specifically, Appellants contend that the Project's potential impact to public safety is an "extraordinary circumstance" that prevents the Forest Service from authorizing the Project pursuant to a CE because the Forest Service selected a project location that will not reduce the risk of wildfire to the Mt. Pinos Communities and is not consistent with the Mt. Pinos Community Wildfire Protection Plan.

That plan, developed in 2006 by the Mt. Pinos Communities Fire Safe Council, which includes representatives from the U.S. Forest Service, identifies three zones that comprise the wildland urban interface. The area where man-made structures are located, like homes, is called the "Defense Zone." The "Threat Zone" is a one-quarter mile buffer around the Defense Zone that "needs specific and intense management and treatments" to "reduce the spread and intensity of fire developing or moving" towards the Defense Zone. The "Wildland Zone" is the area beyond the "Threat Zone." Approximately ninety-three percent of the Proposed Project lies in the Wildland Zone, while the remaining seven percent of the Project is located in the Threat Zone.

Appellants contend that the Forest Service's decision to construct a fuelbreak in the Wildland Zone, instead of in the Threat Zone, is arbitrary and capricious. They note that the original, 2006 version of the Community Wildfire Protection Plan did not include any projects located within the Wildland Zone, although the Plan was updated to add the Tecuya Ridge Fuel Break Project, as well as other projects located in the Wildland Zone, in 2009.

Appellants also point to the results of a scientific study[8] showing that "constructing fuel breaks in remote, backcountry locations will do little to save homes during a wildfire because most firefighters will be needed to protect the wildland-urban interface, and fires will not be stopped by those fuel breaks that are located farther away." That study concluded that "[f]irefighter access to fuel breaks was the most influential factor in fuel treatment outcome" for the Los Padres Forest.

The Forest Service, however, was not required to examine impacts to public safety or fuelbreak location efficacy in analyzing whether extraordinary circumstances prevented the use of CE-6 for the Project. Consistent with 36 C.F.R. § 220.6, the Forest Service analyzed each resource condition and determined that the Project would have "no significant impact" on each. Although the list of resource conditions located at 36 C.F.R. § 220.6(b) is not intended to be exhaustive, NEPA merely permits, rather than requires, the Forest Service to consider additional factors during its extraordinary circumstances review. *See, e.g.*, NEPA Procedures, 73 Fed. Reg. 43,084, 43,091 (July 24, 2008) ("The list of resource conditions is intended as a starting place and does not preclude consideration of other factors or conditions by the responsible official with the potential for significant environmental effects."). Courts have therefore rejected the contention that the Forest Service is required to analyze additional factors on top of the specified resource conditions in determining whether extraordinary circumstances prevent the application of a CE. *See All. for the Wild Rockies,* 979 F. Supp. at 1127 (finding that the Fish

---

[8] Syphard et al., *Comparing the Role of Fuel Breaks Across Southern California National Forests*, Forest Ecology and Mgmt., Feb. 2011, at 2038–48.

and Wildlife Service did not need to analyze certain factors set out under a different regulation related to bull trout habitat in determining "no extraordinary circumstances" prohibited its application of CE-6 to a proposed project).

Regardless, the Forest Service's decision to locate the Tecuya Ridge Project in the "Wildland Zone" instead of the "Threat Zone" was not arbitrary and capricious. The Los Padres National Forest Strategic Community Fuelbreak Improvement Project Fire/Fuels Report states that while most existing fuelbreaks are in "high hazard chaparral areas," a few fuelbreaks, like the one contemplated here, "are in coniferous forest and serve to limit fire spread from or towards communities or timber stands in poor condition." The Cuddy Valley/Tecuya Stand Improvement Projects Fire/Fuels Report also notes that "[t]o reduce the threat of spotting distance from firebrands (spotting potential), fuels would need to be reduced both near and *at some distance* from the WUI [Wildland Urban Interface]." (emphasis added). The Decision Memo for the Project further explains that the Forest Service chose the project location to strategically "connect to past and future treatment areas on both public and adjacent private lands." It was therefore reasonable for the Forest Service to conclude that the Project location will "provide a buffer between developed areas and wildlands," one of the goals of the Mt. Pinos Community Wildfire Protection Plan.

Nor is there evidence that the proposed fuelbreak will be constructed in a "remote backcountry location" that will fail to facilitate firefighter access. The Tecuya Ridge fuelbreak will be located around communities within the wildland-urban intermix, including Pine Mountain Club, Pinon Pines Estates, Lake of the Woods, and Frazier Park. Sixty-six percent of the Project overlaps with the Antimony IRA,

which is linearly shaped and adjacent to major roadways. There are 3.9 miles of Forest system road, 1.1 miles of county roads, and approximately 1.5 miles of Forest permitted roads in the Antimony IRA. Firefighters may access the Antimony IRA via developed roads and trails. Thus, the fuelbreak location does not appear to be too remote for firefighters to approach in the case of wildfire.

Whether the location of the fuelbreak proposed for the Tecuya Ridge Project will serve to protect the Mt. Pinos Communities from wildfire is "a classic example of a factual dispute the resolution of which implicates substantial agency expertise." *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 376 (1989). Because the Forest Service has substantiated its decision to place the Tecuya Ridge Project within the Wildland Zone with evidence in the record, its decision was not arbitrary and capricious. The Court declines to substitute Appellants' judgment for that of the agency on this point. *See Morongo Band of Mission Indians v. Fed. Aviation Admin.*, 161 F.3d 569, 573 (9th Cir. 1998).

## CONCLUSION

Because the Forest Service's determination that the Tecuya Ridge Shaded Fuelbreak Project complies with the Roadless Area Conservation Rule is arbitrary and capricious, we **VACATE** the district court's order granting summary judgment to Appellees and the Forest Service's Decision Memo approving the Tecuya Ridge Shaded Fuelbreak Project and **REMAND** this case to the Forest Service to provide adequate substantiation for its determination that 21-inch dbh trees are "generally small diameter timber" within the Project Area.

R. NELSON, Circuit Judge, dissenting:

I agree with Sections I.B and II of the majority opinion. As the majority recognizes, the Forest Service "has adequately explained its determination that the Project will maintain or improve one of the roadless area characteristics." Maj. Op. 14. The majority wrongly holds, however, that the Forest Service's determination that 21-inch dbh trees are "small diameter" was arbitrary or capricious under the Administrative Procedure Act. I therefore respectfully dissent as I would deny the petition for review.

Under the Roadless Rule, the Forest Service can only approve the commercial thinning of "generally small diameter timber." Special Areas; Roadless Area Conservation, 66 Fed. Reg. 3244, 3273 (Jan. 12, 2001) (previously codified at 36 C.F.R. § 294.13). The majority assumes that this requires the Forest Service to explain in detail why 21 inches dbh is small diameter. But such a detailed explanation is not required. As long as the Forest Service considers the factors laid out in the relevant federal regulations, the agency need not provide a separate exhaustive explanation of what trees are generally small diameter.

As the majority acknowledges, the regulations do not define what constitutes "generally small diameter timber." Maj. Op. 16. A single definition for "small diameter timber" makes no sense; such determinations must be project-specific and guided by local ecological considerations in which the Forest Service has expertise. 66 Fed. Reg. at 3257. The regulations require only that the Forest Service use its expertise to determine which trees are small diameter depending on "the great variation in stand characteristics between vegetation types in different areas," "the

characteristics and interrelationships of plant and animal communities associated with the site and the overall landscape," and how the "cutting or removal" of trees will "affect the potential for future development of the stand." *Id*. The Forest Service adequately complied with this administrative directive.

Over the course of preparing the Tecuya Ridge Project Proposal, the Forest Service thoroughly analyzed local plant-animal relationships and the future development of the tree stands in the Project, including how removal "would mimic the role and legacies of natural disturbance regimes." *See* 66 Fed. Reg. at 3257. It completed a botany report, a fire fuels report, two decision memoranda, and a briefing paper that specifically analyzed whether the Project complied with CE-6 and the Roadless Rule. Silvicultural specialists surveyed and conducted exams and walk-throughs in the Project area. The Forest Service identified forest stands that were overstocked due to their size and density, subject to insect attack due to resource competition, and at imminent risk of creating a "fire ladder" fuel profile. It determined that forest stands over 120 square feet per acre needed to be thinned to at least 80 feet per acre. It calculated the size of trees that should be retained for California condors and northern goshawks. And it decided that—to meet the stated goals that the majority accepts, Maj. Op. 15—only smaller diameter trees up to 21 inches dbh should be cut for safety or operability reasons, especially early seral species including Jeffrey and pinyon pine.

After this comprehensive ecological analysis, the Forest Service concluded that trees under 21 inches dbh "needed to be thinned to meet the desired conditions of the proposed action to a 90 percent effective[ness] level." As the majority notes, "[e]ven when an agency explains its decision with

'less than ideal clarity,' a reviewing court will not upset the decision on that account 'if the agency's path may reasonably be discerned.'" *Alaska Dep't of Env't Conservation v. EPA*, 540 U.S. 461, 497 (2004) (quoting *Bowman Transp., Inc. v. Ark.–Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974)). Here, the record allows us to reasonably discern the Forest Service's "path" in considering the regulatory requirements. *See id.* That is enough to survive our deferential review for arbitrary or capricious agency action. *See Nat'l Family Farm Coal. v. EPA*, 966 F.3d 893, 923 (9th Cir. 2020) (agency decision is arbitrary or capricious "only if the agency relied on factors Congress did not intend it to consider, . . . or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise" (citation omitted)).

The majority reaches the opposite conclusion by improperly comparing the Tecuya Ridge Project here to the Frazier Mountain Project, which it says "likely contains a similar stand composition." Maj. Op. 18. One of three alternatives presented in that Project deemed trees large diameter at 10 inches dbh. True, the Tecuya Ridge Project and the Frazier Mountain Project are located nearby in the same national forest. But the Los Padres National Forest spans approximately 1.75 million acres, ranges in elevation by over 8,000 feet, and consists of two separate land divisions.[1] As the Forest Service explains, the two projects contain different compositions of tree species. Nothing in the record undermines that finding. Judges are hardly

---

[1] *Los Padres National Forest*, Nat'l Forest Found., https://www.nationalforests.org/our-forests/find-a-forest/los-padres (last visited Oct. 28, 2021); *Los Padres National Forest – Animals and Plants*, U.S. Forest Serv., https://www.fs.usda.gov/detailfull/lpn f/about-forest/?cid=FSM9_034061 (last visited Oct. 28, 2021).

equipped, as the majority does, to second-guess the agency's evaluation of a forest stand's composition.[2] Especially when the regulations require that the Forest Service's analysis be done on a project-by-project basis, the agency need not explain why small diameter may vary between projects. We cannot rely on the Frazier Mountain Project to provide a workable definition of small diameter trees for the Tecuya Ridge Project. 66 Fed. Reg. at 3257 (determinations best made through "project specific . . . analyses").

We likewise cannot assume, as the majority does, that because the Los Padres Land Management Plan describes large diameter trees as greater than 24 inches dbh, trees up to 21 inches dbh are "at best, . . . medium sized." Maj. Op. 17. The Plan's reference to 24 inches dbh as large diameter only refers to "shade intolerant conifer species." According to the record, shade-intolerant conifers include *ponderosa* pine, which are not listed as within the Project. Nothing in the record suggests that the trees in the Project are shade intolerant. Further, if large diameter trees, sixteen years ago when the Plan was adopted, were "old growth" trees, then today those old growth trees would be even larger. Even if we could rely on the Plan's reference, small diameter trees today would be smaller than or even up to 24 inches dbh. The federal regulations do not suggest that the Forest Service is bound by past data. Instead, they direct the Forest Service to consider the "potential for future development of the stand." 66 Fed. Reg. at 3257. In reality, all trees can be

---

[2] For instance, the majority states that the Tecuya Ridge Project is filled with "Singleleaf pinyon-California juniper" trees. Maj. Op. 6. But "singleleaf pinyon" and "California juniper" are two different tree species, and "Single-leaf pinyon-California juniper" in the Los Padres Land Management Plan describes a woodland including trees of those two species.

small or large diameter—as long as the record shows, as it does here, that the Forest Service adequately considered the regulatory factors.

Finally, the majority ignores basic rules of administrative law. The majority correctly notes that we cannot "require the Forest Service to undertake any particular method of providing a reasoned explanation for its choice." Maj. Op. 20. But then it ignores that principle and finds that the Forest Service failed to provide "the average or median dbh of the trees." *Id.* at 16–17. Neither the Roadless Rule nor the related regulations require such an analysis. To the contrary, the regulations list very different considerations—namely, local "vegetation types in different areas" and the "future development of the stand"—which seems to exclude the average or mean dbh as a basis for determining small diameter. 66 Fed. Reg. at 3257. Indeed, the majority's requirement to analyze the average or mean dbh would be particularly detrimental to old growth forest stands because it would allow thinning of larger trees without consideration of the regulatory factors. Regardless, the court may not "impose upon the agency its own notion of which procedures are best." *Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council*, 435 U.S. 519, 549 (1978) (internal quotation marks omitted).

The right question is not "what trees objectively fall into the category of small diameter trees?"—it is "did the Forest Service perform project-specific analyses to support its conclusion that less-than-21-inch dbh trees should be thinned under project-specific circumstances?" The Forest Service did not seek to establish a one-size-fits-all rule that 21 inches dbh was small diameter in all projects. Instead, it determined that the Tecuya Ridge Project included mechanically thinning trees that were less than 21 inches dbh

and that the portion of the Project encompassing the Antimony IRA complies with the Roadless Rule.[3]  The Forest Service explicitly stated that "[t]his diameter would be needed to be thinned to meet the desired conditions." This conclusion was neither arbitrary nor capricious under the discretion granted to the Forest Service by federal regulations.  I therefore respectfully dissent.

---

[3] About 48 percent of the total 40,153 acres of the Antimony IRA, which overlaps with the Project, is pinyon woodlands, sagebrush, and other conifers.  Tree thinning would occur on only 1,075 acres of the Antimony IRA, or less than 3 percent of the IRA.